# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| THE ESTATE OF MARQUEZ SMART, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 14-2111-JPO |
| | ) | |
| THE CITY OF WICHITA, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## ORDER

This case arises from the fatal shooting of Marquez Smart by police officers in Wichita, Kansas, on March 10, 2012. Plaintiffs, Smart's estate and heirs, bring claims under federal and Kansas law against defendants, the City of Wichita ("the City") and Wichita police officers Lee Froese and Aaron Chaffee. Plaintiffs allege the officers used excessive force in seizing Smart, and that this was due to an unlawful policy, practice, or custom adopted by the City. Plaintiffs further allege defendants acted negligently under Kansas law. Defendants have moved for summary judgment as a matter of law on all claims (ECF No. 190). For the reasons discussed below, the court grants the motion as to

the federal claims and declines to exercise supplemental jurisdiction over the remaining state-law claims.[1]

Also ripe for resolution are two motions to exclude testimony: (1) defendants' motion to exclude rebuttal expert testimony (ECF No. 187) and (2) defendants' motion to exclude the expert testimony of Michael Lyman (ECF No. 188). Because the court dismisses all claims in this case, these motions are moot.

## I.    Facts

The following facts are taken from the record and viewed in the light most favorable to plaintiffs. In the early morning hours of March 10, 2012, Smart was fatally shot by Officers Froese and Chaffee. The shooting occurred in an entertainment area of Wichita known as Old Town, as hundreds of people emptied out of bars and concert venues at closing time. Smart had gone to a concert that evening, and then had joined the crowd socializing on Mosley Street. Officer Froese had been assigned to the area to assist with crowd control. Officer Chaffee, a member of the gang intelligence unit, had gone to Old Town after another officer reported seeing a gun in a vehicle in the area.

Mosley Street runs north-south through Old Town. There is a parking garage on the west side of Mosley Street, about mid-way between 1st Street on the south and 2nd Street on the north. On the night of the shooting, Officer Froese parked his patrol car such that it

---

[1] The parties have consented to the undersigned U.S. Magistrate Judge, James P. O'Hara, conducting all proceedings in this case, including deciding dispositive motions. ECF No. 183.

blocked the north entrance to the parking garage. As the bars let out around 1:45 a.m., 200-300 people socialized outside the parking garage, just south of Officer Froese's car. Officer Froese left his car and started walking east across Mosley Street to intervene in what he viewed as a potential fight. He heard a shout coming from his right and immediately thereafter heard a gunshot to his right (which would be to his south). Officer Froese turned toward the sound of the shot. He saw Smart, who was wearing a yellow shirt, on the sidewalk in front of the mid-portion of the parking garage. Officer Froese testified that he perceived Smart to be holding a gun and then to fire two more shots.[2] Officer Froese's vision became focused on Smart, who was facing south or southeast.

Meanwhile, Officer Chaffee was monitoring the crowd from a small retaining wall on the east side of Mosley Street, across from the north entrance to the parking garage. He had his attention focused on a crowd gathering in front of the parking garage. He saw a group of people start to scatter and run south down the west side of Mosley Street. He heard gunshots and saw a black man in a yellow shirt—Smart—in front of the parking garage on the west side of Mosely Street. Officer Chaffee testified that it appeared the man was holding a gun pointed south toward the crowd. Officer Chaffee heard four or five gunshots. Neither Officer Froese nor Officer Chaffee saw anyone other than Smart holding a gun.

---

[2] Whether Smart actually held or fired a gun is a matter of dispute, which is addressed below. *See infra* Section III.A.

Immediately after the first gunshot was heard, people in the crowd panicked and began running, with most people running south. Smart turned and started running north on the sidewalk along the edge of the parking garage. Officer Froese did not lose sight of Smart as he ran north, and Office Chaffee only lost sight of Smart briefly when Smart passed people. Officer Froese ran west across Mosley Street to intersect Smart. Officer Froese testified he perceived Smart to be carrying a gun. Officer Froese fired his gun at Smart as Smart neared the north entrance of the parking garage. Smart did not stop and kept running north. Officer Froese began to close the gap between himself and Smart. Smart passed Officer Froese's parked patrol car and began to turn west down an alleyway that borders the northside of the parking garage. Officer Froese then fired two or three shots at Smart from a distance of four-to-five feet behind him. Officer Froese did not know at the time whether any of his shots hit Smart.

Officer Chaffee heard the second volley of gun shots when he was on the east side of Mosley Street, but moving west across the street to intercept Smart. Officer Chaffee did not know who had fired the shots—whether an officer or Smart. When he reached the west side of Mosley Street, Officer Chaffee fired at Smart, who had just turned west down the alleyway. Smart fell to the ground, with his arms outstretched and his head to the west. He appeared to look back and shake his head. Smart was shot three more times by Officer

Chaffee.[3]  Smart never pointed a gun at any officer or other person while the officers were chasing him.  An autopsy revealed Smart was hit with five bullets, all entering from his backside.

A .45 caliber handgun, with its magazine missing, was found in the alleyway west of Smart's head and about ten feet away.  A .45 caliber magazine, along with two .45 caliber casings, were found along the path Smart had run after witnesses first reported hearing the sound of gunfire.  The casings were linked to the .45 caliber handgun that was found.  The magazine had seven cartridges, with the top one loaded backwards; a cartridge loaded backwards creates a stoppage that will prevent a gun from firing until the stoppage is cleared.

Plaintiffs filed this lawsuit against the City and Officers Froese and Chaffee in March 2014.  As listed in the pretrial order,[4] which supersedes all pleadings, plaintiffs assert the following claims:

(1)     UNDER 42 U.S.C. § 1983, UNREASONABLE SEIZURE, AGAINST OFFICERS FROESE AND CHAFFEE -- In their capacity as officers of the Wichita Police Department ("WPD"), Officers Froese and Chaffee intentionally deprived Smart of his Fourth and Fourteenth Amendment right under the United States Constitution and Section

---

[3] Plaintiffs cite the deposition testimony of Deshawn Wheaton for the proposition that Officer Chaffee fired the final three shots into Smart's back.  But Wheaton's testimony is clear that Wheaton saw Officer Froese fire the final shots. Wheaton Dep. 20:24-21:1, 28:7-13.  All the other evidence in the record indicates Officer Chaffee shot the final shots. Thus, the court accepts this fact as plaintiffs propose, but not based on the evidence plaintiffs cite.

[4] ECF No. 184 at 10.

O:\ORDERS\14-2111-JPO-190.docx

15 of the Kansas Bill of Rights to be free from unreasonable seizure, by subjecting Smart to excessive use of force.

(2)     UNDER 42 U.S.C. § 1983, UNLAWFUL POLICY, PRACTICE, OR CUSTOM, AGAINST THE CITY OF WICHITA -- The City and WPD adopted an official policy, practice, or custom in which it would be permissible for WPD officers to use deadly force in violation of 42 U.S.C. § 1983 and the Fourth and Fourteenth Amendments of the United States Constitution.

(3)     NEGLIGENCE AGAINST OFFICERS FROESE AND CHAFFEE -- Officers Froese and Chaffee breached their duty of care to Smart by negligently shooting him in the back under circumstances that did not warrant or justify such action.

(4)     WRONGFUL     DEATH/SURVIVOR     ACTION     AGAINST     ALL DEFENDANTS -- Smart's death was not justified or excused under the laws of either the United States or the State of Kansas, and was therefore wrongful.

Defendants move for summary judgment on each of these claims.

## II.     Summary Judgment Standards

Summary judgment is appropriate if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law."[5] A fact is "material" if, under the applicable substantive law, it is "essential to the proper disposition of the claim."[6]  An issue of fact is "genuine" if "there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way."[7]  Thus, "the mere existence of some alleged factual dispute between the parties will not defeat an

---

[5] Fed. R. Civ. P. 56(c).

[6] *Becker v. Bateman*, 709 F.3d 1019, 1022 (10th Cir. 2013).

[7] *Id.*

otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact."[8]  In applying this standard, the court views the facts in the light most favorable to the non-moving party.[9]

When a defendant asserts qualified immunity at the summary-judgment stage, however, the traditional summary-judgment analysis does not apply to the court's determination of the immunity issue.[10]  Rather, a presumption is raised that the defendant is immune from suit,[11] and the burden is shifted to the plaintiffs "to show that: (1) the defendant violated a constitutional right and (2) the constitutional right was clearly established."[12]

As noted above, defendants seek summary judgment on all four of plaintiffs' claims. The court will now address them in turn.

---

[8] *Thomas v. Durastanti*, 607 F.3d 655, 665 (10th Cir. 2010) (quoting *Scott v. Harris*, 550 U.S. 372, 380 (2007)) (emphasis in original).

[9] *See White v. Pauly*, 137 S. Ct. 548, 550 (2017); *Tolan v. Cotton*, 134 S. Ct. 1861, 1863 (2014) (stating that all justifiable inferences are to be drawn in favor of the non-moving party).

[10] *Thomson v. Salt Lake Cty.*, 584 F.3d 1304, 1327 (10th Cir. 2009) (Holmes, J., concurring).

[11] *Perea v. Baca,* 817 F.3d 1198, 1202 (10th Cir. 2016) ("Appellants' assertion of qualified immunity creates a presumption that they are immune from suit.").

[12] *Pauly v. White*, 874 F.3d 1197, 1214 (10th Cir. 2017) (quoting *Martinez v. Beggs*, 563 F.3d 1082, 1088 (10th Cir. 2009)).

### III. 42 U.S.C. § 1983 Excessive-Force Claim Against Officers Froese and Chaffee, and Their Assertion of Qualified Immunity

Plaintiffs' first claim, brought under 42 U.S.C. § 1983, alleges Officers Froese and Chaffee used excessive force when they killed Smart. In a § 1983 action, a claim is brought against a government official to impose individual liability for actions taken by the official under color of state law.[13] To establish individual liability, plaintiffs must show the official "caused the deprivation of a federal right."[14] An official sued under § 1983 may assert qualified immunity, which is immunity from suit, rather than a mere defense to liability.[15] Officers Froese and Chaffee have asserted qualified immunity here.

Before analyzing the officers' qualified-immunity defense, the court must briefly address the fact that plaintiffs attempt to premise their § 1983 claim on the Fourteenth Amendment and on the Kansas Bill of Rights, in addition to the Fourth Amendment. As defendants point out in their motion, excessive-force claims arising from force used "leading up to and including an arrest" are properly analyzed under the Fourth Amendment. The Fourteenth Amendment applies to claims of force brought by pretrial detainees—which Smart was not.[16] And § 1983 cannot be used to redress violations of state law, such

---

[13] *Kentucky v. Graham*, 473 U.S. 159, 165 (1985).

[14] *Id.*

[15] *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985); *Mecham v. Frazier*, 500 F.3d 1200, 1203 (10th Cir. 2007).

[16] *See Estate of Booker v. Gomez*, 745 F.3d 405, 419 (10th Cir. 2014).

as the Kansas Bill of Rights.[17]  Plaintiffs do not address these concerns in their response to the motion for summary judgment, and indeed make their legal arguments under Fourth-Amendment standards.[18]  Thus, to the extent plaintiffs' § 1983 excessive-force claim is premised on the Fourteenth Amendment or the Kansas Bill of Rights, judgment is entered for defendants.

The court now turns to Officers Froese and Chaffee's assertion of qualified immunity on plaintiffs' Fourth Amendment excessive-force claim.  Qualified immunity is a judge-made doctrine that arose out of the Supreme Court's recognition in the 1960s and 1970s of constitutional-tort liability for public actors.[19]  Under the doctrine, defendants named in a § 1983 action may raise a defense of qualified immunity, which, if applicable, shields them from suit.[20]  The Supreme Court has stated that the function of qualified immunity is to balance "two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from

---

[17] *See Youngblood v. Qualls,* No. 17-2180-JAR, 2018 WL 1695497, at *10 (D. Kan. April 6, 2018).

[18] *See* ECF No. 197 at 75 ("In *Graham v. Connor*, the Supreme Court held that all excessive force claims should be analyzed under the reasonableness standard of the Fourth Amendment, which is alleged in the present matter.").

[19] *See Monroe v. Pape*, 365 U.S. 167, 172 (1961) (authorizing individuals to pursue constitutional-tort claims against city police officers under the Civil Rights Act of 1871 (now codified at 42 U.S.C. § 1983)); *Bivens v. Six Unknown Named Agents of the Fed. Bureau of Narcotics*, 403 U.S. 388, 397 (1971) (authorizing individuals to pursue constitutional-tort claims against state and federal officials).

[20] *Pauly*, 874 F.3d at 1214 (internal quotations and citations omitted).

9

harassment, distraction, and liability when they perform their duties reasonably."[21]  On one side of the scale, "the threat of liability encourages . . . officials to carry out their duties in a lawful and appropriate manner."[22]  And on the other side of the scale, immunity is valuable in "avoid[ing] excessive disruption of government" and "ensur[ing] that talented candidates [are] not deterred by the threat of damages suits from entering public service."[23]  In the years since its birth, the qualified-immunity doctrine has evolved to shield officials from litigation in all but the rare case involving pre-existing law that places the unlawfulness of an official's particular conduct "beyond debate."[24]

As mentioned above, when a defendant asserts qualified immunity, a presumption is raised that he is immune from suit and the burden is placed on plaintiffs to show the defendant (1) violated a constitutional right and (2) the constitutional right was clearly established.[25]  Courts have discretion to decide the order in which they consider these two prongs, and may end the analysis if plaintiffs fail to satisfy either requirement.[26]

---

[21] *Pearson v. Callahan*, 555 U.S. 223, 231 (2009).

[22] *Forrester v. White*, 484 U.S. 219, 223 (1988).

[23] *Wyatt v. Cole*, 504 U.S. 158, 166-67 (1992).

[24] *See* Kit Kinports, *The Supreme Court's Quiet Expansion of Qualified Immunity*, 100 Minn. L. Rev. 62, 66 (2016) (quoting *Ashcroft v. al-Kidd*, 536 U.S. 731, 741 (2011)). Given the heightened standard, a plaintiff's failure to meet it should not be construed as a stamp of approval for the official conduct in question.

[25] *Pauly*, 874 F.3d at 1214 (quoting *Martinez*, 563 F.3d at 1088).

[26] *Tolan*, 134 S. Ct. at 1866; *McCoy v. Meyers,* 887 F.3d 1034, 1048 (10th Cir. 2018) (citing *Pearson v. Callahan*, 555 U.S. 223, 236 (2009)).  In the interest of further defining Fourth Amendment rights, the court undertakes the first prong of the immunity analysis,

"[U]nder either prong, courts may not resolve genuine disputes of fact in favor of the party seeking summary judgment."[27] Rather, as with all motions for summary judgment, the facts are viewed in the light most favorable to the non-moving party.[28] "The evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor."[29] An officer's version of events is not to be credited if it conflicts with the "factual matrix most favorable to [plaintiffs]."[30] "Once the relevant facts are determined with all reasonable inferences drawn in favor of the non-moving party," whether one or both prongs have been satisfied is a "pure question of law.'"[31]

## A. Determination of Relevant Facts

The parties present vastly different versions of what unfolded on the night of Smart's death. Under defendants' version, Smart "fired a gun into a large crowd," then began running with the gun and "ignoring instructions to drop the gun."[32] Under plaintiffs' version, Smart was unarmed and was running "like everyone else . . . to get away from the

---

even though the court could grant Officers Froese and Chaffee's request for immunity based solely on plaintiffs' failure to satisfy the second prong.

[27] *Tolan*, 134 S. Ct. at 1866.

[28] *White*, 137 S. Ct. at 550.

[29] *Tolan*, 134 S. Ct. at 1863 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)).

[30] *Carr v. Castle*, 337 F.3d 1221, 1227 (10th Cir. 2003).

[31] *Cordova v. Aragon*, 569 F.3d 1183, 1188 (10th Cir. 2009) (quoting *Scott,* 550 U.S. at 381 n.8).

[32] ECF No. 191 at 30-31.

conflict," when he was shot from behind without any warning from officers.[33]  Before the court can determine the legal question of whether the officers' use of deadly force was reasonable under clearly established law, the court must determine which version the facts support.  In making this factual determination, the court applies the standards set out above, viewing genuine disputes of fact in the light most favorable to plaintiffs.

Was Smart Holding a Gun?

Perhaps the factual question most material to the court's analysis is whether Smart was seen holding a gun during the incident.  Officers Chaffee and Froese's clear testimony is that Smart was holding a gun.  Officer Froese testified that after he heard the first gunshot that night, he turned toward the sound and "saw Marquez Smart with his hand extended . . . with a big black gun in his hand, and then I saw two more shots, and I saw muzzle flash, so I know it was coming from him."[34] Officer Froese testified that Smart was standing on the sidewalk outside the parking garage and shooting southeast toward a crowd of people standing on Mosely Street.[35]  Officer Froese did not see anyone else with a gun when he turned toward the sound of the initial gunshot.[36]  Officer Froese further testified that he saw Smart running with the gun in his hand.

---

[33] ECF No. 197 at 78.

[34] Froese Dep. at 105:13-17.  *See also id.* at 110:16-111:14, 123:5-8.

[35] *Id*. at 111:6-14. *See also id.* at 117:1-4.

[36] *Id*. at 119:3-5.

Similarly, Officer Chaffee testified that after he heard the initial gunshot to his south, his attention was drawn to Smart, who was standing "with the gun punched out," "with his right arm indexed out at the crowd."[37] Officer Chaffee testified that Smart ran north, carrying a gun in his right hand.[38] Officer Chaffee did not see anyone else in the crowd holding a gun, but he was focused on Smart and not looking for another one.[39]

The testimony of Officers Chaffee and Froese is supported by the testimony of Officer Brad Crouch, who stated he saw Smart running with a "dark object" in his hand, which Crouch saw was a handgun after Smart fell and the gun went sliding across the alleyway.[40]

In addition to the officers, a civilian witness at the scene named Adron Jones testified he saw Smart carrying a gun and that Smart ran with the gun.[41] Jones testified he did not see Smart shoot the gun, but believed Smart fired the initial shots because after Jones heard those shots, Smart immediately ran past him carrying a gun.[42] Jones testified

---

[37] Chaffee Dep. at 111:13-112:3, 113:21. *See also id.* at 117:16-19 ("I remember hearing the gunshots, and I remember the muzzle flash, and seeing him with the gun.").

[38] *Id*. at 149:3-12. *See also id*. at 158:20-21 ("Mr. Smart was still running with the gun."); *id.* 135:8-20 ("I would see him running with a gun on this side, and then he'd run behind somebody, and I'd see him still running with a gun on the other side.").

[39] *Id*. at 128:15-129:6.

[40] Crouch Dep. at 57:1-58:9; plaintiffs' response to Defendants' Statement of Fact ("DSF") 145.

[41] Jones Dep. at 9:3-25, 10:23-11:19, 21:6-10, 65:12-22.

[42] *Id*. at 36:8-22.

Smart dropped the gun south of the entrance to the parking garage after the first shots fired by an officer.[43]  Smart was the only person Jones saw carrying a gun.[44]

In addition, defendants note it is undisputed that a .45 caliber handgun (with magazine missing) was recovered about ten feet from where Smart fell after being shot.[45] Sergeant Robert Gulliver testified that when he reached Smart just seconds after the shooting stopped, the firearm was west of Smart's head.[46]  A magazine to a .45 handgun was found on the path between the location where officers first noticed Smart and where Smart came to rest.[47]  Also found along that path were Smart's eyeglasses and two .45 caliber shell casings that were specifically linked to the recovered handgun.[48]

Plaintiffs, on the other hand, argue that Smart did not display a gun on the night he was shot.  They point to evidence that could indicate Smart did not have a gun.  First, plaintiffs cite the testimony of seven witnesses to the event, all of whom stated they did not see a gun in Smart's possession.  Audras Wilson testified he went with Smart to a concert in Old Town that night, but lost track of Smart after the concert let out.  Wilson was not near Smart when the initial gunshots were heard, but he witnessed Smart running while

---

[43] *Id*. at 65:12-66:1.

[44] *Id*. at 16:5-9.

[45] Craig Dep. 124:15-19; DSF 150.

[46] Gulliver Dep. at 60:1-22.

[47] Craig. Dep. 122:8-12; DSF 151.

[48] *Id*. at 84:11-85:24; DSF 155-56.  The eyeglasses were broken.

14

police officers shot at him. Wilson did not see Smart, or anyone other than police officers, holding a gun.[49] Wilson testified he did not know Smart as "ever having a gun."[50] Rolando Miller was a friend of Smart and was standing near Smart as the incident unfolded. He testified that he heard gunshots and then both he and Smart started running.[51] Miller stated he never saw Smart with a gun that night and, to his knowledge, Smart did not own a gun.[52] DeShawn Wheaton was on Mosely Street after attending a concert. He testified that after he heard gunfire, he looked around and saw an officer shooting at a black man (Smart).[53] Wheaton did not see anything in Smart's hands.[54] Latyra James, an acquaintance of Smart, testified that she was standing near Smart when she heard the first gunshot, and that the gunshot did not come from near her.[55] James testified she did not see Smart hold a gun or fire a shot.[56] Sergeant Gulliver testified that he witnessed Officer Froese chasing Smart. Initially, he could not tell that Officer Froese's weapon was drawn, and did not realize Officer Froese was shooting Smart until he saw a muzzle flash.[57] He also did not see a gun

---

[49] Wilson Dep. at 19:22-20:4.

[50] *Id.* at 19:20-21.

[51] Miller Dep. at 22:1-22.

[52] *Id.* at 44:6-15.

[53] Wheaton Dep. at 19:16-20:6.

[54] *Id.* at 20:5-6.

[55] James Dep. at 16:12-17:17.

[56] *Id.* at 17:4-10, 20:15-16.

[57] Gulliver Dep. at 51:22-52:10.

in Smart's hand, but testified "[Smart] passed me running north. So with everything going on, I did not see a gun in his hand. . . . I'm not saying it's not possible he had a gun."[58] Officer Garrett Shaddix, who was stationed near the parking garage when the shooting began, said in an interview that the first time he saw Smart was when Smart was lying on the ground and he did not see a gun near Smart.[59] Officer Matthew Phillips, who was also positioned on Mosley Street, saw Smart after the shooting began and could not see anything in Smart's hands.[60] Plaintiffs also note Detective Rick Craig, the lead detective investigating the shooting for the WPD, testified that no civilians told him they saw Smart fire a gun.[61]

Plaintiffs also point to the lack of physical evidence connecting Smart to a gun. Detective Craig testified that no physical evidence was found indicating the handgun recovered near Smart belonged to Smart.[62] No fingerprints could be obtained from the

---

[58] *Id*. at 52:11-18, 57:20-22, 66:23-67:19.

[59] Plaintiffs' Statement of Fact ("PSF") 74. Although defendants object that the interview transcript plaintiffs cite is inadmissible hearsay, they do not controvert the underlying fact.

[60] PSF 82. Although defendants object that the interview transcript plaintiffs cite is inadmissible hearsay, they do not controvert the underlying fact.

[61] Craig Dep. at 91:21-92:11. Although plaintiffs state, "Craig testified that no civilians saw Smart *holding* or firing a gun that night," ECF No. 197 at 5 (emphasis added), Craig's cited testimony only addressed whether any civilians saw Smart *fire* a gun. Craig, in fact, did testify that civilian Jones saw Smart holding a gun. Craig Dep. at 75:13-22.

[62] Craig Dep. at 207:14-19; PSF 164.

recovered gun or magazine.[63]  Although swabs were taken from the gun, the WPD did not

test the swabs for Smart's DNA.[64]  Plaintiffs' expert, Dr. Christian Westering, did test DNA

from several samples obtained from the gun.[65]  Tests from three samples indicated Smart

could be excluded as a DNA match.[66]

Finally, the chief medical examiner who performed the autopsy of Smart, Dr. Jamie

Oeberst, testified she examined Smart's hands, looking for evidence of a gun having been

fired, and found no gunshot residue or other indication that Smart had fired or held a gun.[67]

Kelly Otis, the chief investigator for the District Attorney's Office, testified that she never

saw any physical evidence that indicated Smart held a gun on the night of the shooting.[68]

As the evidence and arguments set out above make clear, there is no doubt a factual

dispute as to whether Smart was carrying a gun on the night of his death.  But the relevant

inquiry is whether this dispute is *genuine*—in other words, given all the evidence, could a

rational juror resolve this issue in plaintiffs' favor?[69]  "When opposing parties tell two

---

[63] Craig Dep. at 177:17-19, 186:3-9.

[64] *Id*. at 177:13-22, 185:11-17; PSF 162.

[65] PSF 176.

[66] PSF 179 (citing Westering Report).  Defendants note plaintiffs fail to cite the specific portion of Westering's report upon which they rely, but do not controvert this fact. Defendants further note Westering concluded Smart could *not* be excluded as a source of DNA from other samples taken from the gun.  *See* Westering Report at 17.

[67] Oeberst Dep. at 57:19-22, 60:10-17, 61:3-17.

[68] PSF 154 (Otis Dep. at 68:2-6).

[69] *Becker,* 709 F.3d at 1022; *see also Thomas*, 607 F.3d at 665 ("The mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly

different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment."[70]

The court is mindful that the Tenth Circuit has directed lower courts not to credit an officer's version of events if it conflicts with the "factual matrix most favorable to [plaintiffs]."[71] Recently in *Pauly v. White*, the Tenth Circuit addressed a situation in which officer testimony indicated the suspect fired a gun, but the physical evidence did not support that finding.[72] The two officers involved in shooting the suspect testified that the suspect had first fired a handgun at one of the officers.[73] The plaintiffs noted, however, that no bullet casing was recovered from the handgun found at the scene, and there was no forensic proof that the suspect fired the gun. The court determined that "based on the physical evidence, a jury could reasonably decide to reject [the officer's] testimony."[74] The court further stated, "since the victim of deadly force is unable to testify, courts should be cautious on summary judgment to 'ensure that the officer is not taking advantage of the

---

supported motion for summary judgment; the requirement is that there be no *genuine* issue of . . . fact." (quoting *Scott*, 550 U.S at 380) (emphasis in original)).

[70] *Scott*, 550 U.S. at 380.

[71] *Carr v. Castle*, 337 F.3d 1221, 1227 (10th Cir. 2003).

[72] 874 F.3d 1197, 1217 (10th Cir. 2017), cert. denied, No. 17-1078, 2018 WL 647013 (U.S. June 18, 2018).

[73] *Id.*

[74] *Id.* (quoting *Abraham v. Raso*, 183 F.3d 279, 294 (3d Cir. 1999)) (internal modifications omitted).

18

fact that the witness most likely to contradict his story—the person shot dead—is unable to testify.'"[75] Finally, the court directed, "the court may not simply accept what may be a self-serving account by the police officer. Rather, it must also look at the circumstantial evidence that, if believed, would tend to discredit the police officer's story."[76] The court concluded that when the evidence was viewed in the light most favorable to the plaintiffs, the jury could conclude the suspect did not fire the recovered gun.[77]

In light of *Pauly's* teachings, the court concludes that whether Smart had a gun is a genuine question of fact that a reasonable juror could decide in plaintiffs' favor. Unlike *Pauly*, there were many witnesses to Officers Chaffee and Froese chasing and shooting Smart. In addition to the testimony of Officers Chaffee and Froese, the court is presented with the testimony of a civilian, Jones, stating that he saw Smart holding a gun. This factor weighs in defendants' favor more so than did the evidence in *Pauly* wherein only the officers involved testified as to the gun. But the court must balance the testimony of Jones, Officer Chaffee, and Officer Froese with the testimony of seven other eyewitnesses who did not see Smart holding a gun. Although defendants correctly note that no witness testified that Smart did *not have* a gun when Officers Froese and Chaffee shot at him, the witnesses could only testify as to their own perceptions. The witnesses testified that they

---

[75] *Id.* at 1217-18 (quoting *Abraham*, 183 F.3d at 294).

[76] *Id.* at 1218.

[77] *Id.*

did not *see* Smart holding a gun, and from this testimony a jury could infer that Smart did not *have* a gun. In addition, Wilson and Miller, who were both friends of Smart and also on the scene, testified that they did not know Smart to own a gun. A reasonable juror could infer from this testimony that Smart did not have a gun on the night he was shot. Defendants assert that some witnesses' failure to see Smart with a gun can be explained by the circumstances—such as the crowd, rapid sequence of events, and the witnesses not focusing on Smart's hands—but these are all nebulous rationales that would be best decided by a jury after hearing from the witnesses themselves.

The absence of physical evidence indicating the suspect shot a gun also is less weighty here than in *Pauly*. In *Pauly*, no bullet casing was found in the living room from which the suspect allegedly fired the shot, which would be very unusual in a small, contained room in a private residence. Here, it is undisputed that a handgun was found near Smart and that a magazine and two bullet casings that matched the handgun were found along the general path traveled by Smart. Nevertheless, the fact remains that no physical evidence connects Smart to the recovered handgun or magazine. No fingerprints were recovered, and although DNA samples taken from the handgun produced mixed results (with some samples unable to exclude Smart as a DNA contributor), it is uncontroverted that some of the samples did exclude Smart as a DNA match.[78] In addition,

---

[78] ECF No. 204 at 3 (stating Westring's report and testimony "make clear that *several samples excluded Smart*, several samples were inconclusive, two samples had too many contributors to test, and two samples tested could not exclude Smart as a contributor.

during the autopsy of Smart, Dr. Oeberst examined Smart's hands, looking for evidence of a gun having been fired, and found no gunshot residue or other indication that Smart had fired or held a gun. Defendants argue this fact is immaterial because Dr. Oeberst did not test for gunpowder residue and believes such residue is not a good indicator of whether one fired a gun. Again, however, the court believes the weight to give Dr. Oeberst's testimony is appropriately left to a jury.

Although this case presents a closer call than *Pauly,* the court concludes the physical and circumstantial evidence, viewed in the light most favorable to plaintiffs, could lead a jury to reject testimony that Smart fired and was holding a gun. Thus, for summary judgment purposes, the court will assume Smart did not hold a gun when he was pursued and shot by police.

### Did the Officers Command Smart to Drop the Perceived Gun?

The second factual dispute material to the Fourth Amendment reasonableness analysis is whether either Officer Chaffee or Froese ordered Smart to drop what each perceived to be a gun, with sufficient time to allow Smart to comply, before firing.[79]

---

The sample from the slide on the .45 handgun could not exclude Smart or 1 in 3 African Americans while the sample from the magazine could not exclude Smart or 1 in 2 African Americans").

[79] As will be discussed further below, if feasible, an officer must give some warning before using deadly force. *Pauly*, 874 F.3d at 1216.

Officer Froese does not recall telling Smart to drop his weapon before he fired at Smart.[80]  However, Officer Chaffee testified that he heard someone say, "drop the gun, drop the gun."[81]  Officer Chaffee stated he believed this instruction came from Officer Froese.[82]  Jones testified, on the other hand, that Officer Froese did *not* say "drop the gun," but only said "stop."[83]  Officer Shaddix, who was stationed near the parking garage on Mosley Street, did not hear any officer give directions to drop a weapon that night.[84]  No other witness testified as to having heard Officer Froese warn Smart to drop his weapon. Given Officer Froese's uncertainty about whether he said anything, Officer Chaffee's uncertainty about who he heard say "drop the gun," the fact that Jones perceived Officer Froese as saying completely different words than Officer Chaffee perceived him as saying, and other persons in the area not having heard any instruction given at all, the court finds there is a genuine factual dispute as to whether Officer Froese warned Smart before shooting.

As to whether Officer Chaffee gave Smart a warning before shooting, only Officer Chaffee testified that he did.  Officer Froese testified that he did not hear Officer Chaffee

---

[80] Froese Dep. Exh. 51, p.27.

[81] Chaffee Dep. at 144:11-18.

[82] *Id.*

[83] Jones Dep. at 53:10-16.

[84] PSF 71.  Although defendants object that the evidence plaintiffs cite in support of this fact is inadmissible hearsay, they do not controvert the underlying fact.

give Smart a verbal warning to drop the gun. Officer Chaffee stated that as he approached Smart, he "gave him a command [] to drop the gun."[85] Officer Chaffee testified he said this "right before" he fired his first shot at Smart.[86] When asked more specifically about the length of time that passed between when he warned Smart to drop the gun and when he fired, Officer Chaffee said, "it was probably pretty quick,"[87] "it was pretty close to me saying it and discharging my firearm,"[88] and "all I know, it was quick."[89] When asked whether Smart would have had time to comply with the warning before Officer Chaffee fired, Officer Chaffee conceded, "probably not."[90] Mindful of *Pauly*'s warning not to "simply accept what may be a self-serving account by [a] police officer,"[91] and considering the circumstantial evidence that Officers Shaddix and Chaffee did not hear such a warning, the court will construe the evidence to be that Officer Chaffee did not give Smart a warning to drop his weapon. In any event, it is undisputed that even if such a warning was given, it was not given with sufficient time to allow Smart to comply before Officer Chaffee fired.

---

[85] Chaffee Dep. at 144:19-21; *see also id.* at 159:14-17.

[86] *Id*. at 162:12-18.

[87] *Id*. at 162:20-23.

[88] *Id.* at 163:1-12.

[89] *Id.* at 164:5-6.

[90] *Id.* at 164:7-8.

[91] 874 F.3d at 1217-18.

Construing the evidence in plaintiffs' favor, the court concludes for summary judgment purposes that neither Officer Froese nor Officer Chaffee instructed Smart to drop his perceived weapon before they fired at him.

<u>Did Officer Chaffee Shoot Smart While Smart was Lying on the Ground?</u>

The final, potentially material factual dispute is whether the last shots fired at Smart were fired after he was lying on the ground. Plaintiffs argue Officer Chaffee shot Smart "in the back, killing him, after he was disarmed and lying on the ground."[92] Defendants assert Smart stumbled and then fell to the ground after Officer Chaffee's second (and last) volley of shots.

Officer Froese testified that he saw Officer Chaffee fire two shots at Smart, Smart then turned, Officer Chaffee fired two more shots, and then Smart stumbled and fell to the ground.[93] Officer Froese did not witness "anybody shoot [Smart] when he was stumbling or on the ground."[94] Officer Chaffee testified that after his first two shots, "it seemed like [Smart] kind of stumbled a little bit."[95] Smart was "[n]ot upright but [was] moving

---

[92] ECF No. 197 at 80.

[93] Froese Dep. at 17:7-11, 146:22-24, 155:5-14.

[94] *Id*. at 155:12-14.

[95] Chaffee Dep. at 172:12-17.

forward."[96]  "Then after the second two [shots] is when he went down, and the gun went out of his hand."[97]

Plaintiffs assert the officers' testimony is contradicted by the testimony of bystanders.  First, Wheaton testified that after he heard two initial shots in quick succession, he turned and saw Officer Froese firing.  He then saw the person being shot at was a black man in a yellow shirt, whom the record indicates was Smart.  Wheaton testified Officer Froese was "speed walking" toward Smart.[98]  When Wheaton saw Smart for the first time, Smart was falling to the ground.[99]  Wheaton testified Smart went to his stomach on the ground with arms outstretched, looked back, and shook his head, and seemed to be saying something.[100]  Wheaton stated that Officer *Froese* walked up behind Smart and from Smart's feet, fired "about three more shots."[101]  After these last three (or so) shots, Smart did not move.  Although Wheaton repeatedly testified he only saw Officer Froese shoot Smart, the parties agree Officer Chaffee fired the last shots, so Wheaton's perception or memory must be faulty in this regard.

---

[96] *Id*. at 184:19-24.

[97] *Id*. at 172:12-17.  *See also id.* at 183:10-23 (stating that after Chaffee's first volley of shots, Smart "was, like, stumbling, I guess, but not on the -- not -- I wouldn't even say on the ground. He was still able to be mobile. And then, after the -- the second volley of shots," is when Smart went down to the ground).

[98] Wheaton Dep. at 24:5-13.

[99] *Id*. at 24:19-25:6.

[100] *Id*. at 27:12-28:2.

[101] *Id*. at 28:10-23.

Also before the court is the testimony of Wilson, who recalled Smart being shot once after falling to the ground. Wilson first testified that after Smart turned west into the alleyway, Officer Froese fired about three shots at Smart.[102] After a four-to-five second gap,[103] Officer Chaffee came from around the parked patrol car and fired at Smart.[104] Smart was shot two more times, fell face down, and "then there was one more shot after that."[105] Wilson testified the three final shots were in quick succession.[106]

In addition, James gave inconsistent testimony about whether she heard shots being fired after she saw Smart fall to the ground. Initially, James stated, "after he hit the ground I heard more shots."[107] But later in her deposition, she stated she heard gunshots as Smart was stumbling and going down, but she did not hear any shots after Smart was on the ground.[108]

Plaintiffs also argue physical evidence supports their theory of the facts. Plaintiffs cite the incident report of Officer Chad Remy.[109] Officer Remy noted that he found two

---

[102] Wilson Dep. at 18:5-19:9.

[103] *Id*. at 24:23-25:8.

[104] *Id*. at 23:15-23.

[105] *Id*. at 19:12-17.

[106] *Id*. at 23:15-24:22.

[107] James Dep. at 24:15-17.

[108] *Id.* at 64:15-22.

[109] Remy Incident Report, ECF No. 197-24; PSF 138-141. Defendants do not controvert these facts, but assert a hearsay objection to their inclusion. Defendants have not cited a case holding police incident reports inadmissible as hearsay. The court's

bullet fragments "lying on the brick that was underneath the black male individual that was lying in the alley,"[110] and that the "fragments were not located until the individual was removed by EMS."[111]

Finally, plaintiffs have presented the expert report of Dr. Wayne K. Ross.[112] Dr. Ross opined that Smart's gunshot wounds to his right hip, left lower back, and center left back were "shored," which indicate Smart "was lying on the ground at the time he was shot."[113] Defendants counter that their expert, Dr. Kris Sperry, testified that the latter two of these wounds were not shored.[114] On summary judgment, the court construes this factual sub-dispute in plaintiffs' favor and assumes three of Smart's exit wounds exhibited shoring characteristics.

---

research indicates police incident reports are typically admissible under the Fed. R. Evid. 803(8) hearsay exception for public records. *See Michell v. Thompson*, No. 12-0316, 2013 WL 12333985, at *3 (D.N.M. March 5, 2013); *see also Walker v. City of Okla. City*, 203 F.3d 837, 2000 WL 135166, at *8 (10th Cir. Feb. 7, 2000) (table) (citing *United States v. Pazsint*, 703 F.2d 420, 424 (9th Cir. 1983) for the proposition that it is "well established that entries in a police report which result from the officer's own observations and knowledge may be admitted"). Thus, without a more developed argument by defendants, the court overrules defendants' hearsay objection to consideration of Remy's report on summary judgment.

[110] Remy Incident Report at 1.

[111] *Id.*

[112] ECF No. 197-27.

[113] *Id.* at 4-6.

[114] Response to PSF 173 (citing Sperry Dep. at 35:4-17).

The evidence discussed above easily could lead a reasonable juror to conclude Smart was not fully on the ground when Officer Chaffee fired his final shot. Of more significance, however, is that a reasonable juror alternately could conclude that Smart was on the ground when Officer Chaffee fired his last three shots. Again, the court is mindful that on summary judgment the court must believe plaintiffs' evidence and draw all justifiable inferences in their favor.[115] The court places little credence in Wheaton's testimony that Officer Froese shot Smart after Smart had fallen to the ground, looked back at the officer, and shook his head as if speaking. The parties agree that Officer Chaffee, not Officer Froese, fired the final shots at Smart. Plaintiffs do not attempt to explain Wheaton's contradictory testimony. However, the court views Wilson's testimony in plaintiffs' favor and takes as true that Smart was shot while on the ground. The court also views James's testimony in the light most favorable to plaintiffs by construing it to be that "shots" were fired after Smart was on the ground. The fact that Officer Remy found two bullet fragments on the ground underneath where Smart's body had lain, construed in plaintiffs' favor, indicates Smart was on the ground when two bullets entered his body.[116] Finally, Dr. Ross's report that three of Smart's exit wounds exhibited shoring characteristics could be construed to indicate three bullets entered Smart's body while Smart was lying on the ground.

---

[115] *Tolan*, 134 S. Ct. at 1863.

[116] Of course, it is also entirely possible that the bullets were fired while Smart was stumbling or falling, and that Smart then landed on top of them.

Thus, construing the evidence in plaintiffs' favor, the court concludes for summary judgment purposes that Officer Chaffee shot Smart three times while Smart was lying on the ground.

### B. Did Officer Froese or Chaffee Violate Smart's Fourth Amendment Right to be Free from Excessive Force?

With the factual landscape set for summary-judgment purposes, the court now evaluates the legal question of whether plaintiffs have satisfied the two prongs of the qualified-immunity analysis. Under the first prong, plaintiffs must show defendants violated a constitutional right. Plaintiffs assert Officers Chaffee and Froese used excessive force and violated Smart's Fourth Amendment rights when they shot him five times from behind, without warning, and when he wasn't holding a weapon. Defendants counter that the officers' actions were reasonable and justified to prevent Smart from harming officers and the public, and to prevent Smart's escape. Even if Officers Chaffee and Froese made a mistake, defendants contend, such mistake was reasonable under the circumstances. As discussed below, the court concludes plaintiffs have met their burden of showing Officers Froese and Chaffee violated Smart's Fourth Amendment rights.

"All claims that law enforcement officers have used excessive force—deadly or not—in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard."[117] This is a

---

[117] *Pauly*, 874 F.3d at 1214–15 (quoting *Graham v. Connor*, 490 U.S. 386, 395 (1989)) (internal modification omitted).

standard of "objective reasonableness," which is "judged from the perspective of a reasonable officer on the scene, rather than with 20/20 vision of hindsight."[118]   "In determining the reasonableness of the manner in which a seizure is effected, [the court] must balance the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion."[119]   Because the "intrusiveness of a seizure by means of deadly force is unmatched," the governmental interests to justify such action is high.[120]   Deadly force is not justified to prevent the escape of a fleeing suspect unless officers have "probable cause to believe the suspect poses a threat of serious physical harm" to the officers or others, and, "where feasible," the officers have given "some warning" to the suspect.[121]

In evaluating whether the use of deadly force was objectively reasonable, the court must consider the "totality of the circumstances"[122]   The Supreme Court has set out three, non-exclusive factors as relevant to the court's analysis.  In *Graham v. Connor,* the Court found important: (1) "the severity of the crime at issue," (2) "whether the suspect poses an

---

[118] *Id.* at 1215 (quoting *Graham,* 490 U.S. at 396).

[119] *Id.* (quoting *Scott*, 550 U.S. at 383).

[120] *Tennessee v. Garner*, 471 U.S. 1, 9 (1985).

[121] *Id.* at 11-12.

[122] *Estate of Larsen ex rel. Sturdivan v. Murr*, 511 F.3d 1255, 1260 (10th Cir. 2008).

immediate threat to the safety of the officers or others," and (3) "whether he is actively resisting arrest or attempting to evade arrest by flight."[123]

First and Second *Graham* Factors

In this case, the analysis of the first and second *Graham* factors merge, as both turn on whether an objectively reasonable officer would have been justified in believing Smart committed the serious crime of shooting into a crowd, such that he posed an immediate threat to the officers and others. In other words, the court must evaluate whether Officers Froese and Chaffee were justified in believing Smart was an "active shooter."

"Whether the suspect poses an immediate threat to the safety of the officers or others" is the "most important and fact intensive factor in determining the objective reasonableness of an officer's use of force."[124] The Tenth Circuit has ruled that "the use of deadly force is only justified if the officer had 'probable cause to believe that there was a threat of serious physical harm to himself or others.'"[125] Significantly, "the law is clear

---

[123] 490 U.S. at 396 (applied in *Pauly*, 874 F.3d at 1215, and *Perea v. Baca,* 817 F.3d 1198, 1202 (10th Cir. 2016)).

[124] *Pauly,* 874 F.3d at 1216 (quoting *Graham*, 490 U.S. at 397).

[125] *Id.* (quoting *Estate of Larsen*, 511 F.3d at 1260) (internal modification omitted); *see also Samuel v. City of Broken Arrow*, 506 F. App'x 751, 753 (10th Cir. 2012) ("It is well established that the use of 'deadly force is justified under the Fourth Amendment if a reasonable officer in the [d]efendant's position would have had probable cause to believe that there was a threat of serious physical harm to themselves or to others.'" (quoting *Walker v. City of Orem*, 451 F.3d 1139, 1159 (10th Cir. 2006))).

31

that [the officer's] belief must be reasonable."[126] However, because the officer's "reasonable perceptions are what matters," he "may be found to have acted reasonably even if he has a mistaken belief as to the facts establishing the existence of exigent circumstances."[127]

In evaluating the seriousness of the threat the suspect poses, the court may consider such factors as whether the suspect made "any hostile motions" with a weapon toward the officers; "whether the officers ordered the suspect to drop his weapon, and the suspect's compliance with police commands;" "the distance separating the officers and the suspect;" and "the manifest intentions of the suspect."[128]

Here, the court has determined, for summary judgment purposes, that Smart did not have a gun on the night he was shot. Thus, Smart could not have been threatening the safety of the officers or bystanders with a weapon. But the court is mindful "that officers are sometimes 'forced to make split-second judgments' in uncertain and dangerous

---

[126] *Id.* at 1221 (quoting *Attocknie v. Smith*, 798 F.3d 1252, 1257 (10th Cir. 2015)).

[127] *Thomas v. Durastanti*, 607 F.3d 655, 666 (10th Cir. 2010) (finding an officer's actions in shooting at a suspect's car as the car started driving away from the officer were reasonable, even though officer had a mistaken view of the facts because the officer was disoriented); *see also Tenorio v. Pitzer*, 802 F.3d 1160, 1164 (10th Cir. 2015) ("The belief need not be correct—in retrospect the force may seem unnecessary—as long as it is reasonable.").

[128] *Pauly*, 874 F.3d at 1216 (quoting *Estate of Larsen*, 511 F.3d at 1260 for this "four component test").

circumstances."[129]   As the Tenth Circuit has warned, "[w]hat may later appear to be unnecessary when reviewed from the comfort of a judge's chambers may nonetheless be reasonable under the circumstances presented to the officer at the time."[130]   Officers Froese and Chaffee have stated they believed Smart to be an active shooter who was a threat to the officers and other bystanders in the crowded area.   The court evaluates the facts to consider whether an objective officer at the scene would have agreed, such that this mistake of fact was nevertheless reasonable.

First, it is undisputed that shots were heard by witnesses and officers in Old Town in the early morning hours at issue.   But whether those shots came from the sidewalk near the middle of the parking garage where Smart was standing is a fact in dispute.   On the one hand, Officers Froese and Chaffee testified they heard the shots come from that direction and turned to see Smart there (indeed, Officer Froese testified he saw Smart fire a gun). They also testified they saw the crowd scatter from that location.   But on the other hand, the court is presented with the testimony of James, who claims to have been standing near Smart when the shots started and heard the shots come from someplace else.   For summary judgment purposes, the court construes James's testimony in the light most favorable to plaintiffs and assumes the initial shots heard did not come from Smart's immediate area.

---

[129] *Phillips v. James*, 422 F.3d 1075, 1080 (10th Cir. 2005) (quoting *Graham*, 490 U.S. at 396–97); *see also Graham*, 490 U.S. at 397 (recognizing, "police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation").

[130] *Id.* (quoting *Graham,* 490 U.S. at 396).

33

Defendants do not suggest how an officer would be objectionably reasonable in reaching the mistaken conclusion that the initial shots were from a gun fired by Smart.

Second, the officers both testified they perceived Smart to be holding a gun. The court deemed this perception mistaken above, but the question is whether it was nevertheless reasonable. As noted, plaintiffs have pointed to evidence showing other witnesses on the scene did not see a gun in Smart's hands. Defendants do not allege Smart's hands were ever hidden. Nor have defendants directed the court to evidence in the record showing that lighting or other conditions made it difficult to see Smart's hands. Viewing the facts in plaintiffs' favor, the court finds a jury could deem unreasonable Officer Chaffee and Froese's perception that Smart held a gun.[131]

Third, it is undisputed that, while most of the crowd ran south after hearing the initial shot, Smart ran north. This is one factor that a reasonable officer might view as indicating

---

[131] *See King v. Hill*, 615 F. App'x 470, 475 (10th Cir. 2015) (officers' mistaken belief that suspect was armed with a gun was not justified where facts viewed in plaintiff's favor indicated suspect's hands were visible); *Walker*, 451 F.3d at 1160 (under plaintiff's version of the facts, it was not reasonable for officer to believe suspect had a gun given the "angle of [suspect's] hands and the amount of light on the scene"). *See also Pauly*, 874 F.3d 1221 ("In our view, there is at least a fact question for the jury as to whether it was objectively reasonable for Officer White to immediately assume that one of his fellow officers was shot after hearing two shots from the back of the house but nothing more to indicate that anyone had been hit."); *Attocknie*, 798 F.3d at 1257 (affirming denial of qualified immunity to officer and rejecting officer's claim he saw suspect run into house, noting "that a jury might reasonably refuse to credit his belief as reasonable" because a jury "could well find that [the officer] is not telling the truth about seeing someone running, or at least that he was not reasonable in inferring that the person he saw was [the suspect], especially given other evidence that [the suspect] was not seen by anyone else at the time and was not found there after the shooting").

Smart was the shooter, not a member of the crowd fleeing the shooter. This fact weighs in defendants' favor.

Fourth, it is undisputed that Smart never threatened the officers or others after he started running north. Officer Froese testified that Smart never made eye contact with him and never raised the gun at him or anyone else.[132] Officer Chaffee testified that when he was chasing Smart, he did not see Smart point a gun at anyone.[133] This fact weighs against the suggestion that an objective officer would have viewed Smart as an immediate threat.

Fifth, Smart was not attempting to close the distance between himself and the officers (or bystanders); rather, he was running away. This likewise suggests Smart did not pose a threat to the safety of the officers or others.

Sixth, construing the facts in plaintiffs' favor, the court has determined no officer gave Smart a warning or ordered him to drop the perceived gun before they shot at him. The Tenth Circuit has noted that "it is clear that 'some warning' must be given before an officer uses deadly force if 'feasible.'"[134] "[O]rders to drop a weapon" are "sufficient warning when 'events were unfolding extremely quickly.'"[135] Defendants argue that, given

---

[132] Froese Dep. at 82:25-83:17.

[133] Chaffee Dep. at 150:15-150:17. *See also* Craig Dep. at 150:9-19 (indicating his investigation did not indicate Smart pointed his gun at officers or anyone else when Officers Froese and Chaffee were chasing him).

[134] *Samuel v. City of Broken Arrow*, 506 F. App'x 751, 754 (10th Cir. 2012) (quoting *Garner*, 471 U.S. at 12).

[135] *Id.* (quoting *Thomson v. Salt Lake Cty.*, 584 F.3d 1304, 1311 (10th Cir. 2009)).

the rapidly evolving and chaotic situation surrounding the chase, Officer Froese's commands to Smart to "stop" and to "drop the gun" were sufficient. Although the court agrees with defendants that such commands, if given, would constitute reasonable warning, the facts for summary judgment indicate no warnings were given.

Perhaps the circumstances were such that it was unfeasible for officers to give any warning. The undisputed facts suggest Old Town was chaotic after shots began.[136] People in the crowd began running and screaming,[137] which likely would have made it difficult for Smart to hear any warning, even if given. In addition, the undisputed testimony from witnesses indicates the entire incident (from the first shot fired by an unknown person to the last shot fired by Officer Chaffee) spanned less than ten seconds.[138] But even assuming it would not have been feasible for the officers to give Smart a warning in this situation,

---

[136] *See* DSF 99 ("After the gunshots started, everybody started panicking and running."); *see also* Wheaton Dep. at 17:1-4 ("A lot of people just took off running, I mean, just haywire. I mean, it's a crowd of hundreds of people. Shot rang off, it's like panic mode."); James Dep. at 42:20-23 ("I was confused on where I should even go when there was so much chaos. Everybody is running, falling, getting stepped on, ran over.").

[137] Jones testified that he didn't think anyone heard Froese's commands because "it's so loud people screaming and stuff." Jones Dep. at 36:21-24. *See also* Wheaton Dep. at 32:1-3 ("Q. And you said everybody's yelling. It was noisy before --. A. Absolutely.").

[138] Jones testified the incident took about five seconds. Jones Dep. at 77:1-5. Gulliver also testified, "it all transpired so quick. I mean, you're talking a matter of 5 seconds. Gulliver Dep. at 59:4-5; *see also id.* at 67:9-11. Wilson testified there was a four-to-five second gap between Froese's shots and Chaffee's shots. DSF 141. Plaintiffs objected to the statements of Gulliver (DSF 94) and Jones (DSF 118) "on the ground that [they] are speculative, lack[] foundation, and [are] improper opinion testimony." These objections are unsupported and overruled.

36

the facts as construed do not demonstrate deadly force was necessary to prevent serious physical harm or to prevent the escape of a suspect who had just committed a crime involving serious physical harm—the other necessary element before deadly force may be used.[139]

Balancing the above considerations, the court finds the totality of the circumstances weigh against a finding that Officers Chaffee and Froese were reasonable in believing Smart had just committed a serious offense or was an immediate threat when they shot at him. This finding makes this case distinguishable from cases cited by defendants in support of their argument that, if the officers were mistaken in their perception that deadly force was justified, such a mistake was nonetheless reasonable.[140] The court reaches its conclusion under the Tenth Circuit's guidance that where there are genuine issues of fact that must be resolved in order to determine whether a suspect posed an immediate threat to

---

[139] *See Garner*, 471 U.S. at 11.

[140] *Cf. Thomas*, 607 F.3d at 665-66 (officer was reasonable in believing he was in harm's way when suspect's car was advancing toward him); *Estate of Larsen*, 511 F.3d at 1260-61 (officer was reasonable in believing suspect was a physical threat where suspect had threatened violence, was armed with a knife, and refused commands to drop the knife); *Thomson v. Salt Lake Cty.*, 584 F.3d 1304, 1318-20 (10th Cir. 2009) (officer was reasonable in believing suspect was a physical threat where suspect had a gun, moved the gun up and down quickly, and did not comply with commands to drop the gun); *Davis v. McCarter*, 569 F. Supp. 2d 1201, 1207-07 (D. Kan. 2008) (uncontroverted that suspect was running through a neighborhood with a gun and refused to comply with officer's multiple commands to drop the gun, and officer inferred suspect was looking for cover from which to fire at officers).

the safety of the officers or others, the second *Graham* factor will not weigh conclusively in the officer's favor.[141]

Third *Graham* Factor

The third *Graham* factor is whether the suspect was "actively resisting arrest or attempting to evade arrest by flight." The relevant inquiry under this factor is whether the force used was "reasonable and proportionate," i.e., "reasonably necessary in the situation to effect a lawful arrest or detention under the circumstances of the case."[142] As mentioned above, it is undisputed that Smart was moving away from the officers. But it is less clear whether a reasonable officer would perceive this movement as an attempt to evade arrest.

Although this is a close question, the undersigned finds there are facts from which a jury could conclude a reasonable officer would not be justified in reaching a determination that Smart was attempting to evade arrest. First, there is no dispute that neither Officer Froese nor Officer Chaffee identified himself as a police officer. This fact weighs in favor of an objective finding that Smart was not attempting to evade arrest. Second, the evidence indicates the scene was chaotic, with a large crowd of people running

---

[141] *See Pauly*, 874 F.3d 1221. *Cf. Plumhoff v. Rickard*, 134 S. Ct. 2012, 2022 (2014) (finding it "beyond serious dispute" that a suspect fleeing by car at speeds over 100 miles per hour and swerving though traffic "posed a grave public safety risk, and . . . the police acted reasonably in using deadly force to end that risk").

[142] *Perea*, 817 F.3d at 1203 (quoting *Cortez v. McCauley*, 478 F.3d 1108, 1114 (10th Cir. 2007)).

after shots were fired (and then continued to be fired by the officers).[143]  Construed in plaintiffs' favor, this fact could indicate to a reasonable officer that Smart was simply acting like everyone else, moving to get away from bullets being fired, rather than moving to evade arrest.  Thus, the third *Graham* factor weighs in plaintiffs' favor.

<u>Changed Circumstances</u>

Even if the undisputed facts indicated Smart presented a threat of serious injury or was fleeing the scene in an attempt to evade arrest—neither of which the court finds—the court would still need to consider whether circumstances changed such that the justification for deadly force was eliminated before Officer Chaffee fired his final volley of shots.  The law is clear that if police officers are justified in firing at a suspect in order to end a severe threat to public or officer safety, "the officers need not stop shooting until the threat has ended."[144]  However, once a suspect is subdued or "has clearly given himself up," the continued use of force is not justified.[145]  "[C]ircumstances may change within seconds eliminating the justification for deadly force."[146]  There is no question that circumstances

---

[143] *See supra* note 136.

[144] *Plumhoff*, 134 S. Ct. at 2022.

[145] *Id.* ("This would be a different case if [officers] had initiated a second round of shots after an initial round had clearly incapacitated [the suspect] and had ended any threat of continued flight, or if [the suspect] had clearly given himself up."); *see also Perea,* 817 F.3d at 1203-04 (holding that "[e]ven if [the suspect] initially posed a threat to the officers that justified tasering him, the justification disappeared when [the suspect] was under the officers' control").

[146] *Thomas v. Durastanti*, 607 F.3d 655, 666 (10th Cir. 2010).

changed here when Smart fell to the ground and Officer Chaffee perceived him to have dropped his weapon, but the court must determine if this change eliminated the justification for deadly force.

The Tenth Circuit applied the changed-circumstances rule in *Fancher v. Barrientos*.[147] There, under the facts determined by the district court for purposes of summary judgment, a suspect fled to an officer's patrol car, which had two loaded guns inside.[148] The officer shot the suspect in the chest, and saw the suspect slump over.[149] The officer then stepped away from the car, which rolled in reverse, away from the officer. The officer fired a second series of shots five-to-seven seconds after the first shots.[150] The district court ruled the evidence was sufficient for a reasonable jury to conclude the officer had time between his first and second series of shots to get out of the way, assess the situation, and know the slumped suspect may have no longer been a threat or able to escape.[151] Thus, the facts could be viewed as giving the officer "enough time . . . to recognize and react to the changed circumstances and cease firing his gun."[152] The district

---

[147] 723 F.3d 1191 (10th Cir. 2013).

[148] *Id.* at 1196.

[149] *Id.* at 1196-97.

[150] *Id.* at 1197.

[151] *Id.* at 1198, 1201.

[152] *Id.* at 1198.

40

court denied qualified immunity as to shots fired after that time, and the Tenth Circuit upheld the ruling.

The facts as determined for summary judgment purposes above indicate Officer Chaffee shot Smart three times after Smart had fallen to the ground. Officer Chaffee perceived Smart to drop his gun when he hit the ground,[153] so the facts could be construed to be that these shots hit Smart after Officer Chaffee perceived Smart to have dropped the gun. The record is unclear how much time passed between Smart falling and Chaffee firing his final volley of shots, but viewing the evidence in the light most favorable to plaintiffs, there could have been as much as a four-to-five-second gap.[154] The question is whether a reasonable officer would have had a chance to see there was no gun in Smart's hand while Smart was lying prone, deem Smart no longer a threat, and then stop shooting. As in *Fancher*, where there was a five-to-seven-second gap, the court finds there to be a question of fact for resolution by a jury as to if a reasonable officer would have had time to "recognize and react to the changed circumstances and cease firing his gun."[155] A jury

---

[153] Chaffee Dep. at 172:12-175:4.

[154] Wilson testified there was a four-to-five second gap between Officer Froese's shots and Officer Chaffee's final shots. DSF 141. Wheaton testified that after Smart was on the ground, he had time to look back toward the officer and shake his head before the officer "walked up" and shot him. Wheaton Dep. at 28:23-29:5. Jones testified the entire incident took about five seconds. Jones Dep. at 77:1-5. Gulliver also testified, "it all transpired so quick. I mean, you're talking a matter of 5 seconds." Gulliver Dep. at 59:4-5; *see also id.* at 67:9-11.

[155] 723 F.3d at 1198. *See also Perea,* 817 F.3d at 1205 (upholding district court determination "that there was sufficient evidence in the record for a reasonable fact finder to conclude that the officers continued to taser Perea after he was subdued").[155] The court

41

could rationally conclude a reasonable officer would have had time to see there was no gun in Smart's hand and that he was not a threat at the time he was shot in the back.[156]  Thus, even if the court had determined above that Smart posed a threat of serious injury or was fleeing the scene in an attempt to evade arrest, the court would still find a factual question precludes a finding in Officer Chaffee's favor on the first qualified-immunity prong.[157]

---

is bound to follow the guidance of *Fancher* and *Perea* over the opinions from the Fourth, Sixth, and Eleventh Circuits cited in defendants' opening brief, ECF No. 191 at 35-38, and in any event, finds the facts as construed herein distinguish this case from those.

    Defendants present the expert testimony of John Ryan, who opined that if an officer is shooting, there is a "reactionary gap" between the time the officer perceives the elimination of a threat and the time the officer stops firing.  Ryan Dep. at 115:10-14, 122:25-123:25, 159:16-160:7.  Plaintiffs object to this testimony on the ground that Ryan admits he is not a scientist and has not conducted any scientific studies on reactionary gap. *See id.* at 122:25-123:25.  Although plaintiffs have not filed a timely motion to exclude Ryan's testimony under Fed. R. Evid. 702 or *Daubert v. Merrell Dow Pharms, Inc.*, 509 U.S. 579 (1993), the court may have an independent obligation to screen purportedly scientific evidence.  *See Daubert*, 509 U.S. at 589; *O'Conner v. Commonwealth Edison Co.*, 13 F.3d 1090, 1094 (7th Cir. 1994).  In any event, while Ryan's testimony on reactionary gap, if admissible, might help the trier of fact "determine a fact in issue," Rule 702(a), it does not conclusively establish that fact (i.e., whether Officer Chaffee had time to recognize and react to changed circumstances).

[156] *See King v. Hill*, 615 F. App'x 470, 475 (10th Cir. 2015) (officers' mistaken belief that suspect was armed with a gun was not justified where facts viewed in plaintiff's favor indicated suspect's hands were visible); *Walker*, 451 F.3d at 1160 (under plaintiff's version of the facts, it was not reasonable for officer to believe suspect had a gun given the "angle of [suspect's] hands and the amount of light on the scene"); *cf. McCoy v. Meyers*, 887 F.3d 1034, 1048 (10th Cir. 2018) (where it was reasonable for officers to believe suspect was reaching for an officer's gun when the officer pulled suspect to the ground, officers' conduct of immediately restraining suspect and hitting him while he was face down with several officers pinning him was reasonable because no reasonable jury would conclude suspect was effectively subdued at the time).

[157] In reaching this conclusion, the court places no weight in plaintiffs' argument that the second shot that hit Smart would have incapacitated Smart's right arm, making

42

The court concludes, in viewing disputed facts in the light most favorable to plaintiffs, Officers Chaffee and Froese violated Smart's Fourth Amendment right to be free from an unreasonable use of deadly force. Plaintiffs have met the first prong of the qualified-immunity analysis.

## C. Did the Officers' Conduct Violate a Clearly Established Right?

Defendants next assert that even if Officers Froese and Chaffee's use of force was unreasonable under the circumstances, the officers are nonetheless entitled to qualified immunity under the second prong of the analysis because the law was not sufficiently clear that their conduct was unconstitutional. The court agrees.

"A clearly established right is one that is 'sufficiently clear that every reasonable official would have understood that what he is doing violates that right.'"[158] "Because the

---

Smart unable to shoot a gun, such that he was no longer a threat to officers. ECF No. 197 at 84. There is no suggestion here that a reasonable officer at the time (as opposed to one viewing the situation with the benefit of facts learned later) would have perceived Smart to have become unable to fire a gun after Officer Froese's second shot hit him.

[158] *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (quoting *Reichle v. Howards*, 566 U.S. 658, 664 (2012)); *see also D.C. v. Wesby*, 138 S. Ct. 577, 589 (2018) ("'Clearly established' means that, at the time of the officer's conduct, the law was 'sufficiently clear' that every reasonable official would understand that what he is doing' is unlawful." (quoting *Ashcroft v. al–Kidd*, 563 U.S. 731, 741 (2011))); *Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018) ("Qualified immunity attaches when an official's conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." (quoting *White v. Pauly*, 137 S. Ct. 548, 551 (2017))); *Samuel v. City of Broken Arrow*, 506 F. App'x 751, 753 (10th Cir. 2012) ("The pertinent question is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation." (citation omitted)).

focus is on whether the officer had fair notice that her conduct was unlawful, reasonableness is judged against the backdrop of the law at the time of the conduct."[159] There "ordinarily must be a Supreme Court or Tenth Circuit opinion on point, or the clearly established weight of authority from other circuits must point in one direction."[160] Where a past case is not directly on point, "existing precedent must have placed the statutory or constitutional question beyond debate.'"[161] "In other words, immunity protects all but the plainly incompetent or those who knowingly violate the law."[162] The Supreme Court has defined this as an "exacting standard" that "'gives government officials breathing room to make reasonable but mistaken judgments.'"[163]

In recent years, the Supreme Court has applied this standard overwhelmingly in favor of law enforcement. Last year, the Court noted in *White v. Pauly* that "[i]n the last five years, this Court has issued a number of opinions reversing federal courts in qualified immunity cases."[164] Because of this trend, the Court found it "again necessary to reiterate the longstanding principle that 'clearly established law' should not be defined 'at a high

---

[159] *Kisela*, 138 S. Ct. at 1152 (quoting *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004)); *see also Wilson v. City of Lafayette*, 510 F. App'x 775, 777 (10th Cir. 2013).

[160] *Malone v. Bd. of Cty. Comm'rs*, 707 F. App'x 552, 555 (10th Cir. 2017) (quoting *Pompeo v. Bd. of Regents*, 852 F.3d 973, 981 (10th Cir. 2017)).

[161] *Kisela*, 138 S. Ct. at 1152 (quoting *White*, 137 S. Ct. at 551).

[162] *Id.* (quoting *White*, 137 S. Ct. at 551).

[163] *City and Cty. of San Francisco v. Sheehan*, 135 S. Ct. 1765, 1774 (2015) (quoting *al–Kidd*, 563 U.S. at 743).

[164] 137 S. Ct. 548, 551 (2017).

44

level of generality.'"[165]  Rather, "the clearly established law must be 'particularized' to the facts of the case."[166]  "The dispositive question is 'whether the violative nature of *particular* conduct is clearly established.'"[167]

The existence of factually similar precedent that "squarely governs" the situation at issue is particularly important when evaluating excessive-force claims.  "Specificity is especially important in the Fourth Amendment context, where the Court has recognized that it is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts."[168]  "Use of excessive force is an area of the law 'in which the result depends very much on the facts of each case,' and thus police officers are entitled to qualified immunity unless existing precedent 'squarely governs' the specific facts at issue."[169]  "Precedent involving similar facts can help move a case beyond the otherwise hazy border between excessive and

---

[165] *Id.* at 552 (quoting *al–Kidd*, 563 U.S. at 742); *see also Kisela,* 138 S. Ct. at 1152 (directing lower courts "not to define clearly established law at a high level of generality").

[166] *White*, 137 S. Ct. at 552 (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)).

[167] *Mullenix,* 136 S. Ct. at 308 (emphasis in original) (quoting *al-Kidd*, 563 U.S. at 742).

[168] *Kisela,* 138 S. Ct. at 1152 (quoting *Mullenix,* 136 S. Ct. at 308) (modification omitted).

[169] *Id*. at 1153 (quoting *Mullenix,* 136 S. Ct. at 309).

acceptable force and thereby provide an officer notice that a specific use of force is unlawful."[170]

In this case, plaintiffs have not directed the court to *any* factually similar case (let alone one from the Supreme Court or Tenth Circuit that was issued before March 10, 2012) that would clearly indicate the actions taken by Officers Froese and Chaffee would constitute excessive force. Instead, plaintiffs cite *Graham* for the proposition that officer use of force must be objectionably reasonable, and note that the Tenth Circuit subsequently recognized that the reasonableness standard is "clearly established" for evaluating excessive force cases.[171] Significantly, however, the Supreme Court expressly stated in *White* that the excessive-force principles set out in *Graham* and its "Court of Appeals progeny," only set forth the law at a "general level," and should not be relied upon as creating clearly established law "outside 'an obvious case.'"[172] The Court subsequently explained that although "general statements of the law are not inherently incapable of giving fair and clear warning to officers, . . . [a]n officer cannot be said to have violated a

---

[170] *Id.* (internal quotation marks and citation omitted).

[171] ECF No. 197 at 75, 89 (citing *Graham v. Connor*, 490 U.S. 386, 395 (1989) and *Wilson v. Meeks*, 52 F.3d 1547 (10th Cir. 1995)).

[172] *White*, 137 S. Ct. at 552 (quoting *Brosseau*, 543 U.S. at 199); *Kisela*, 138 S. Ct. at 1153 (quoting *White*, 137 S. Ct. at 552). *See also Mullenix*, 136 S. Ct. at 309 ("The general principle that deadly force requires a sufficient threat hardly settles this matter [of whether the officer acted reasonably]."); *Malone*, 707 F. App'x at 556 (recognizing that "in *Mullenix*, an excessive-force case, the Supreme Court rejected as too general the 'rule that a police officer may not use deadly force against a fleeing felon who does not pose a sufficient threat of harm to the officer or others'").

clearly established right unless the right's contours were sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it."[173]   Thus, in relying only on general legal principles to defeat qualified immunity, plaintiffs bear the heavy burden of showing Officer Chaffee and Froese's conduct was obviously egregious.

Plaintiffs have not satisfied this onerous standard.[174]   In the absence of precedent squarely governing "the specific facts at issue" in this Fourth Amendment case, the court cannot find Officers Chaffee and Froese's actions "plainly incompetent" or "in knowing violation of the law" when their actions are judged from the perspective of an officer on the scene forced to make split-second judgments in an indisputably chaotic situation.[175]   No one disputes shots were fired into a crowd of hundreds gathered in a one-block area during the early morning hours.  Officers were confronted with a chaotic situation and the need to

---

[173] *Kisela,* 138 S. Ct. at 1153 (quoting *White*, 137 S. Ct. at 552, and *Plumhoff,* 134 S. Ct. at 2023). *See also Wesby*, 138 S. Ct. at 590 ("Of course, there can be the rare 'obvious case,' where the unlawfulness of the officer's conduct is sufficiently clear even though existing precedent does not address similar circumstances." (quoting *Brosseau,* 543 U.S. at 199).

[174] It is, of course, the task of the district court to apply the law as handed down by the Supreme Court and the Tenth Circuit, and the court does so here.  But the court is troubled by the continued march toward fully insulating police officers from trial—and thereby denying any relief to victims of excessive force—in contradiction to the plain language of the Fourth Amendment.  As Justice Sotomayor has aptly noted, "Such a one-sided approach to qualified immunity transforms the doctrine into an absolute shield for law enforcement officers, gutting the deterrent effect of the Fourth Amendment." *Kisela*, 138 S. Ct. at 1162 (Sotomayor, J., dissenting).

[175] *Kisela,* 138 S. Ct. at 1152.

quickly disarm the shooter to protect innocent bystanders. Following the shots, the bulk of the crowd ran south, while Smart ran north. It was not egregious for Officers Chaffee and Froese to shoot at Smart under the mistaken perception that he was the active shooter.

It further was not a plain or knowing violation of the law for Officer Chaffee to have shot Smart in the seconds after Smart had fallen to the ground. Again, plaintiffs have not cited, and the court has not found, a factually similar case that would make the unlawfulness of Officer Chaffee's actions apparent. To be sure, the Tenth Circuit has stated repeatedly the general rule that continued use of force against a subdued suspect who no longer presents a threat of danger or escape violates the Fourth Amendment.[176] But under the *White* Court's strict interpretation of "clearly established" (i.e., that "'clearly established law' should not be defined 'at a high level of generality'" and "must be 'particularized' to the facts of the case"),[177] this general rule, although "absolutely relevant in determining whether a police officer acted unreasonably, . . . cannot alone serve as a basis for concluding that an officer's particular use of excessive force was 'clearly established.'"[178]

---

[176] *See, e.g., Perea*, 817 F.3d at 1202, 1204-05 (citing cases); *Fancher*, 723 F.3d at 1200-01.

[177] *White*, 137 S. Ct. at 552 (internal citations omitted).

[178] *Pauly*, 874 F.3d at 1223 (internal quotations and citation omitted).

There is no case "close enough on point"[179] to render it "beyond debate"[180] that Officer Chaffee's shooting of Smart, in the four-to-five seconds after Smart fell, was unconstitutional. As noted above, all of the witnesses agree that the entire incident–from the initial shots to the end of the offices' shots—lasted a matter of seconds. The scene was chaotic, with a large number of people in the area. No precedent suggests a reasonable officer in this situation necessarily would have perceived Smart to have dropped his gun, mentally registered that fact, concluded Smart was no longer a threat (even given other factors such as the large crowd and Smart's continued mobility), and reacted by ceasing fire, all within that four-to-five second period. For example, this case is distinguishable from *Fancher* in which five-to-seven seconds passed between the officer's shot subduing the suspect and his subsequent shots.[181] In addition to the temporal difference, the officer in *Fancher* testified he felt safer after moving away from the car driven by the suspect, and saw the suspect slump, but "nevertheless continued shooting."[182] Here, the facts indicate Smart was still moving (even if on the ground) and was thus potentially dangerous or at liberty to escape during the seconds between Officer Chaffee's shots. Smart was not handcuffed. Although, as noted above, the court finds a jury could conclude Officer

---

[179] *Id.*

[180] *Kisela*, 138 S. Ct. at 1152 (quoting *White*, 137 S. Ct. at 551).

[181] 723 F.3d at 1197.

[182] *Id.*

49

Chaffee's actions violated Smart's Fourth Amendment rights, the court does not find the law on this point (as to Officer Chaffee's particular conduct) clearly established.

If the facts are as plaintiffs say they are, this is an undeniably tragic case involving the shooting death of an unarmed young man. But applying binding precedent, the court concludes plaintiffs have not shown that settled Fourth Amendment law prohibited Officers Chaffee and Froese's actions. Because the law did not establish "beyond debate" that the officers' actions were unconstitutional, defendants are entitled to qualified immunity on plaintiffs' excessive-force claim. Defendants' motion for summary judgment on plaintiffs' § 1983 claim against Officers Froese and Chaffee is granted.

## IV.     42 U.S.C. § 1983, *Monell* Claim Against the City

Plaintiffs' second § 1983 claim alleges that the City, through the WPD, adopted an official policy, practice, or custom in which it would be permissible for WPD officers to use deadly force in violation of the Fourth Amendment. Plaintiffs seek to hold the City liable under *Monell v. Department of Social Services*, a case in which the Supreme Court determined that municipalities can be subject to § 1983 liability "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury . . . ."[183]  Although cities may not be found liable merely because an officer commits a constitutional violation,

_____

[183] 436 U.S. 658, 691 (1978).

they may be liable under § 1983 for their own unconstitutional policies.[184]  "A § 1983 suit against a municipality for the actions of its police officers requires proof that (1) an officer committed a constitutional violation and (2) a municipal policy or custom was the moving force behind the constitutional deprivation that occurred."[185]

As discussed above, the court has found a genuine issue of material fact as to whether Officers Froese and Chaffee committed a Fourth Amendment violation.  The court must therefore consider whether plaintiffs have pointed to a "genuine issue of material fact as to whether a municipal policy or custom was the moving force behind the constitutional deprivation."[186]

Plaintiffs base their *Monell* claim on an alleged pattern and practice by the WPD of "not conducting adequate investigations or internal investigations for officer-involved shootings."[187]  Plaintiffs assert that past WPD Chief Norman Williams set a policy of not conducting internal investigations, which ensured officers would not be disciplined for

---

[184] *Monell*, 436 U.S. at 691; *Barney v. Pulsipher*, 143 F.3d 1299, 1307 (10th Cir. 1998).

[185] *Estate of Laren ex rel. Sturdivan v. Murr*, 511 F.3d 1255, 1264 (10th Cir. 2008); *see also Cordova v. Aragon*, 569 F.3d 1183, 1194 (10th Cir. 2009) ("To succeed in a § 1983 claim against a municipality, a plaintiff must show two elements: '(1) a municipal employee committed a constitutional violation, and (2) a municipal policy or custom was the moving force behind the constitutional deprivation.'" (quoting *Walker*, 451 F.3d at 1152).

[186] *Cordova*, 569 F.3d at 1194.

[187] ECF No. 197 at 92.

misconduct or policy violations.[188]  Plaintiffs argue the WPD's pattern and practice of not

conducting internal investigations "fostered a 'shoot to kill' attitude among members of

the police force."[189]  Plaintiffs contend that the WPD's investigation into Smart's death

was "particularly egregious" and inadequate because, for example, the WPD did not

conduct a DNA test on the recovered gun, did not consider bullet trajectory, did not pursue

leads contrary to police officers' version of events, and did not test Smart's hands for

firearm residue.[190]

Defendants contend the City is entitled to summary judgment on this claim because

plaintiffs have not pointed to evidence indicating the City's investigation policies led to

the actions of Officer Froese and Chaffee on March 10, 2012.  The court agrees.

"A municipality is not liable for the constitutional violations of its employees simply

because such a violation has occurred; a policy or custom must have *actually caused* that

violation."[191]  "To establish the causation element, the challenged policy or practice must

be 'closely related to the violation of the plaintiff's federally protected right.'"[192]  The

plaintiffs must "demonstrate a direct causal link between the municipal action and the

---

[188] ECF No. 184 at 7-8.

[189] ECF No. 197 at 92.

[190] Final Pretrial Order, ECF No. 184 at 7.

[191] *Cordova*, 569 F.3d at 1194 (emphasis added).

[192] *Schneider v. City of Grand Junction*, 717 F.3d 760, 770 (10th Cir. 2013) (quoting Martin A. Schwartz, Section 1983 Litigation Claims & Defenses, § 7.06[A] (2013)).

deprivation of federal rights."[193]  Plaintiffs have failed to establish such a close nexus between the City's alleged custom of inadequate internal investigations and Officers Chaffee and Froese's shooting of Smart.  Plaintiffs do not direct the court to any earlier officer-involved shootings that were not investigated, let alone to evidence that Officers Chaffee or Froese knew of such a failure to investigate.  In fact, plaintiffs admitted that, at the time of the shooting, "neither Froese nor Chaffee were aware of any policy or practice of the Wichita Police Department to defer or delay the internal professional standards review of officer-involved shootings."[194]  Plaintiffs further admitted that "[n]either Froese's nor Chaffee's actions in shooting Smart were affected by any policies or practices of the Wichita Police Department regarding the internal review of officer-involved shootings."[195]  The court agrees with the recent comments of U.S. District Judge Eric F. Melgren in *Richard v. City of Wichita,* stating, "[e]ven if the City had a custom of not earnestly investigating excessive force cases, there is no reason to believe that such a custom directly caused the shooting of [the suspect.]"[196]

---

[193] *Id.*; *see also Carr v. Castle*, 337 F.3d 1221, 1231 (10th Cir. 2003) (holding plaintiff failed to meet the casual-linkage test where the allegedly inadequate training of officers could not be said to "have led directly to the use of excessive force").

[194] Pl. Response to DSF 166.

[195] Pl. Response to DSF 167. Even accepting as true plaintiffs' conclusory, unsupported statement that the City's custom or policy fostered a "shoot to kill environment," ECF No. 197 at 95, plaintiffs pointed to no evidence that this environment led to the shooting of Smart.

[196] No. 15-1279-EFM, 2016 WL 5341756, at *11 (D. Kan. Sept. 23, 2016).

Finally, to the extent plaintiffs challenge the sufficiency of the WPD investigation into Smart's shooting, "basic principals [sic] of linear time prevent [the court] from seeing how conduct that occurs *after* the alleged violation could have somehow caused that violation."[197] While "a failure to investigate or reprimand might . . . cause a future violation by sending a message to officers that such behavior is tolerated," it does not, "in and of itself[,] constitute a causal connection in the immediate case."[198]

Because plaintiffs fail to point to facts showing a City custom or policy was the moving force behind Smart's shooting, judgment is entered for the City on plaintiffs' § 1983 *Monell* claim.

## V.     State Law Negligence Claims

Plaintiffs, in their capacities as the administrators of Smart's estate and as the heirs of Smart, bring survival and wrongful-death claims, respectively, for negligence under Kansas law.[199] The court has pendent jurisdiction to hear these claims because they were

---

[197] *Cordova*, 569 F.3d at 1194 (emphasis in original).

[198] *Id.*

[199] Kansas's wrongful death statute (K.S.A. 60-1901) and survivor statute (K.S.A. 60-1801) do not establish stand-alone claims, but instead provide mechanisms for Smart's heirs and estate administrators, respectively, to assert negligence claims. *See Richard*, 2016 WL 5341756, at *8 n.76 (citing *Marler v. Hiebert*, 960 F. Supp. 253, 254 (D. Kan. 1997) as holding: "Under Kansas law at least two causes of action can arise when a person is killed due to the alleged negligence of another. Under K.S.A. § 60-1801, the administrator of the decedent's estate may bring a cause of action for the decedent's injuries prior to death ('survival action'). Conversely, under § 60-1902, an heir of the decedent may bring a wrongful death action for the loss suffered by all heirs after death.").

54

joined with plaintiffs' federal claims.[200]  With the dismissal of plaintiffs' federal claims, however, the court has discretion to decline to exercise jurisdiction over the state-law claims.[201]  The Tenth Circuit has directed, "When all federal claims have been dismissed, the court may, and usually should, decline to exercise jurisdiction over any remaining state claims."[202]  The parties raise extensive arguments pertaining to plaintiffs' state-law claims, some of which involve questions of Kansas law that are unsettled (or, at least, not strongly established) under this federal court's law.[203]  These complex questions would best be

---

[200] 28 U.S.C. § 1367(a).

[201] 28 U.S.C. § 1367(c)(3) ("The district courts may decline to exercise supplemental jurisdiction over a claim . . . if the district court has dismissed all claims over which it has original jurisdiction[.]").

[202] *Koch v. City of Del City*, 660 F.3d 1228, 1248 (10th Cir. 2011) (quoting *Smith v. City of Enid ex rel. Enid City Comm'n*, 149 F.3d 1151, 1156 (10th Cir. 1998)); *see also Brooks v. Gaenzle*, 614 F.3d 1213, 1229 (10th Cir. 2010) (ruling that where federal claims are dismissed before trial, leaving only issues of state law, a federal court should ordinarily decline to exercise supplemental jurisdiction).

[203] For example, defendants argue they are entitled to summary judgment on these claims under the "adoptive immunity" provision of the Kansas Tort Claims Act ("KTCA"), K.S.A. 75-6104(i).  As the parties acknowledge, there is a split of opinion among judges in this district over whether adoptive immunity categorically protects a defendant from liability where the defendant has qualified immunity from suits brought under § 1983. *Compare Gilliam v. USD No. 244 Sch. Dist.*, 397 F. Supp. 2d 1282, 1289–90 (D. Kan. 2005) *with Arceo v. City of Junction City*, 182 F. Supp. 2d 1062, 1094 (D. Kan. 2002).

As a second example, defendants present an alternative argument for summary judgment on the ground that Kansas does not recognize a negligence cause of action in police-use-of-force cases.  Addressing a similar argument in R*ichard*, Judge Melgren noted that, although judges in this district have held that Kansas does recognize such a cause of action, Kansas "law is somewhat unclear" on the question.  *Richard*, 2016 WL 5341756, at *8.

55

resolved by Kansas state courts. Accordingly, the court concludes that plaintiffs' state-law claims should be dismissed without prejudice.[204]

IT IS THEREFORE ORDERED that defendants' motion for summary judgment (ECF No. 190) is granted as to plaintiffs' two federal claims brought under 42 U.S.C. § 1983.

IT IS FURTHER ORDERED that plaintiffs' remaining claims arising under Kansas law are dismissed without prejudice.

IT IS FURTHER ORDERED that defendants' two motions to exclude expert testimony (ECF Nos. 187 & 188) are moot.[205]

Dated August 7, 2018, at Kansas City, Kansas.

---

[204] *See Jackson v. City of Wichita*, No. 13-1376-KHV, 2017 WL 106838, at *15-17 (D. Kan. Jan. 11, 2017) (granting qualified immunity to officers on excessive-force claims and dismissing claims for negligence and battery under Kansas law which raised "novel and complex legal issues under Kansas law"); *Herington v. City of Wichita*, No. 14-1094-JTM, 2017 WL 76930 (D. Kan. Jan. 1, 2017) (granting summary judgment to defendants on § 1983 claim for excessive force and dismissing state-law claims without prejudice). *See also George v. Newman*, 726 F. App'x 699, 708-09 (10th Cir. 2018) (affirming district court's grant of summary judgment to officers on federal claims of excessive force and retaliation, but reversing district court's grant of summary judgment on state-law battery claim and remanding that claim with instructions to dismiss it without prejudice*); Brooks v. Gaenzle*, 614 F.3d 1213, 1230 (10th Cir. 2010) (affirming district court's grant of summary judgment to officers on federal claims of excessive force, conspiracy, and malicious prosecution; reversing district court's grant of summary judgment to officers on the remaining state-law claim of assault and battery, and remanding that claim with instructions to dismiss it without prejudice to refiling in state court).

[205] This holding is without prejudice to the motions being refiled should this case be returned to the court by Tenth Circuit remand.

56

_s/ James P. O'Hara_

James P. O'Hara
U.S. Magistrate Judge

57