IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| THE ESTATE OF MARQUEZ SMART, | ) | |
| BY RANDAL SMART & BRENDA | ) | |
| BRYANT, AS ADMINISTRATORS OF | ) | |
| THE ESTATE OF MARQUEZ SMART, | ) | |
| AND RANDAL SMART AND BRENDA | ) | |
| BRYANT, AS HEIRS OF MARQUEZ | ) | |
| SMART, DECEASED | ) | Case No.:  2:14-CV-02111-EFM-JPO |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| THE CITY OF WICHITA, OFFICER LEE | ) | |
| FROESE, AND OFFICER AARON | ) | |
| CHAFFEE, IN THEIR INDIVIDUAL AND | ) | |
| OFFICIAL CAPACITY | ) | |
| | ) | |
| Defendants. | ) | |

**PLAINTIFFS' MOTION FOR RECONSIDERATION
AND MEMORANDUM IN SUPPORT**

Pursuant to Rule 59(e) of the Federal Rules of Civil Procedure and Local Rule 7.3, Plaintiffs, the

Estate of Marquez Smart, by Randal Smart and Brenda Bryant, as Administrators of the Estate of

Marquez Smart, and Randal Smart and Brenda Bryant, as heirs of Marquez Smart (collectively "the

Smarts"), submit this Motion for Reconsideration and ask the Court to reconsider its Order (Doc. 205)

granting Defendants' Motion for Summary Judgment. In its Order, the Court failed to view the facts in

the light most favorable to Plaintiffs and draw all inferences in their favor.[1] And, as a result, the Court

drew inferences that improperly benefitted Defendants. Specifically, when the Court turned to its analysis

of whether the constitutional right at issue was clearly established, the Court stopped viewing inferences

in favor of Plaintiffs and in fact gave Defendants the benefit of inferences drawn from disputed facts. In

---

[1] *McCoy v. Meyers*, 887 F.3d 1034, 1044 (10th Cir. 2018) (holding that on motion for summary
judgment, all disputed facts must be resolved in favor of non-moving party and non-moving party is
entitled to all reasonable inferences from the record).

particular, the Court improperly inferred that when Marquez Smart ran north after shots were fired on the night of March 10, 2012, that his behavior was unusual or atypical of the other individuals scattering in Old Town that night or had anything to do with Froese and Chaffee zeroing in on Smart. Second, that the direction Smart ran gave Officers Lou Froese and Aaron Chaffee the mistaken perception that Smart was an active shooter. The Court acknowledged that this was the **only fact** the Court found weighing in Defendants' favor in the Court's analysis of qualified immunity.

## INTRODUCTION

It is axiomatic that a police officer is never warranted in using deadly force against an individual who posed no objective threat of harm to officers or others, had committed no crime, did not possess a weapon, and was not attempting to flee the scene in an attempt to evade arrest. Yet, under the facts viewed in the light most favorable to Marquez Smart, that is precisely what Officers Lee Froese ("Froese") and Aaron Chaffee ("Chaffee") did when they shot and killed Marquez Smart while he was running in panic after shots rang out in Old Town in the early morning hours of March 10, 2012.

The record, properly construed in the light most favorable to Smart, shows that, at the time of the shooting: there were several hundred people, along with a group of Wichita police officers, milling around in Old Town after the clubs closed when shots rang out. After shots were fired, the crowd erupted in panic. Smart was hanging out with a group of friends near the south entrance of a parking garage when the shots rang out. Alarmed, Smart, among others, ran north toward a nearby alley. Smart had committed no illegal act, was suspected of no crime, did not have a weapon and did not fire into the crowd. Faced with these facts, the other officers did not hone in on Smart as the suspected shooter or perceive him to be a threat. In fact, none of the other WPD officers on the scene reacted to Smart. But not Chaffee and Froese. They perceived Smart as a threat and thought it was necessary to use deadly force. And so, without warning or identifying themselves, Chaffee and Froese opened fire on the crowd as they tried to gun down Smart from behind as he ran toward the safety of

2

the alley with a crowd of other panicking civilians running pell-mell through Old Town. Smart, after taking a bullet to the elbow and hip, fell to the ground. As he lay on the ground writhing in pain, at least four to five seconds passed as Chaffee approached him and pumped three more rounds into his back, executing him. Three other civilians were also shot by Chaffee and Froese when they panicked and indiscriminately fired into the crowd, killing an unarmed man who posed no objective threat to the officers or others. Put simply, Chaffee and Froese shot and killed an unarmed black man in the prime of his youth without justification.

Despite the grisly events of March 10, 2012 precipitated by Froese's and Chaffee's reckless disregard for Smart's Fourth Amendment rights and the other citizens who were collateral damage that night, this Court entered an Order granting Defendants' Motion for Summary Judgment on Plaintiffs' two federal claims and dismissing without prejudice Plaintiffs' state-law claims. To be sure, this Court correctly determined that Chaffee and Froese violated Smart's Fourth Amendment right to be free from an unreasonable use of deadly force. But the Court erred in finding that Froese and Chaffee were entitled to qualified immunity, holding that the officers violated no "clearly established" law.

In reaching its conclusion, the Court found that: (1) Marquez Smart did not have a gun; (2) that it was unreasonable for Chaffee and Froese to believe he had a gun; (3) that neither Froese nor Chaffee identified themselves nor instructed Smart to drop his perceived weapon before they shot and killed him; (4) that Smart did not resist or evade arrest; (5) and that Chaffee had enough time to see that Smart did not have a gun or pose a threat before shooting him three times in the back as he was lying on the ground. Based on these factual conclusions, among others, the Court determined that a reasonable jury could find that "Officers Chaffee and Froese violated Smart's Fourth Amendment right to be free from an unreasonable use of deadly force."[2]

---

[2] Doc. 205, p. 43.

Yet, despite this finding, the Court granted qualified immunity to Chaffee and Froese because it "was not sufficiently clear that their conduct was unconstitutional."[3] This was in error. It is long-standing, black letter law that "a police officer may not seize an unarmed, nondangerous suspect by shooting him dead."[4] Indeed, there is no question that at the time of the incident at issue here the law concerning when the use of deadly force is appropriate was clearly established. There was clear and ample Supreme Court and Tenth Circuit case law which predated Smart's killing by many years prohibiting Froese's and Chaffee's unconstitutional conduct.

Viewing the facts in the light most favorable to Smart, as this Court must at summary judgment, a jury could find that Chaffee and Froese violated Smart's clearly established Fourth Amendment rights by needlessly resorting to lethal force and that Chaffee shot Smart in the back even though Smart presented no immediate or objective threat to the officers or others. In holding otherwise, the Court misapprehended the facts and misapplied the law. Therefore, Plaintiffs' respectfully request this Court to reconsider its Order.

## STANDARD OF REVIEW

Rule 59(e) provides for motions to "alter or amend" a judgment if the motion is filed within twenty-eight days of the judgment.[5] Rule 59(e) relief is available in limited circumstances, including when there is: "(1) an intervening change in the controlling law, (2) … new evidence previously [which was] unavailable, and (3) the need to correct clear error or prevent manifest injustice."[6] A motion for reconsideration is appropriate where the court has misapprehended the facts, a party's position or the

---

[3] Doc. 205, p. 43.

[4] *Tennessee v. Garner*, 471 U.S. 1, 11 (1985); *see also* U.S.C.A. Const.Amend. 4; *King v. Hill*, 615 Fed.Appx. 470, 479 (10th Cir. 2015) ("[A]t the time Deputy Hill shot Mr. King, the law was clearly established that an officer could not shoot an unarmed man who did not pose any actual threat to the officer or to others.")

[5] Fed. R. Civ. P. 59(e).

[6] *Hayes Family Trust v. State Farm & Cas. Co.*, 845 F.3d 997, 1004 (10th Cir. 2017)(quoting *Servants of the Paraclete v. Does*, 204 F.3d 1005, 1012 (10th Cir. 2000)).

controlling law.[7] Here, the Court has misapprehended the facts, improperly viewed the facts in favor of Defendants and failed to draw all inferences in Smart's favor. Based on the Court's misapprehension and failure to apply the proper summary judgment standard when it analyzed whether the constitutional right at issue was clearly established, the Court concluded that "it was not egregious for Officers Chaffee and Froese to shoot Smart under the mistaken perception that he was the active shooter."[8] In doing so, the Court improperly drew an inference in Defendants' favor that is not supported by the record – namely, that the direction Smart ran after shots were fired was unusual or atypical or had anything to do with Froese and Chaffee zeroing in on Smart.

## LEGAL ARGUMENT AND AUTHORITIES

In its Order, the Court found that in the chaos that erupted in Old Town the night Marquez Smart was gunned down by an unreasonable use of force by Froese and Chaffee, he ran north "while most of the crowd ran south after hearing the initial shot."[9] The Court found that "[t]his is one factor that a reasonable officer might view as indicating Smart was the shooter, not a member of the crowd fleeing the shooter."[10] Later, in its analysis about whether Plaintiffs met "the heavy burden of showing that Officer Chaffee and Froese's conduct was obviously egregious," the Court relied on this "undisputed fact" in concluding that Chaffee and Froese did not act egregiously.[11] In fact, this was the only fact the Court found that a reasonable officer might view as indicating Smart was the shooter, not a member of the crowd fleeing the shooter. In making this determination, however, the Court not only misinterpreted the facts, it failed to view the facts in the light most favorable to Smart and to draw all inferences in his favor. Additionally, this "undisputed" fact is actually not a fact at all. Numerous people ran with Smart,

---

[7] *Servants of Paraclete*, 204 F.3d at 1012 (internal citation omitted).
[8] Doc. 205, p. 48.
[9] Doc. 205, p. 34.
[10] *Id.* at pp. 34-35.
[11] *Id.* at p. 48.

or in the direction of Smart, including, but not limited to, Rolando Miller, Darel Lucas and Ta'Tiona Nolen.

Moreover, neither Chaffee nor Froese testified that the direction in which Smart ran after the initial shots were fired played **any** role in their unreasonable determination that Smart was an active shooter or a fleeing felon. Rather, Chaffee testified that he thought Smart was the shooter because Smart was last person to start running and allegedly had his arm extended pointing a gun at the people that were running.[12] Froese, meanwhile, testified that he locked in on Smart when he purportedly saw Smart brandishing a weapon.[13] Yet this Court, erroneously viewing the facts in the light most favorable to Defendants, inferred that Chaffee and Froese mistakenly perceived Smart as an active shooter, not based on their testimony or the arguments set forth by Defendants, but rather based on a theory espoused *sua sponte* only by this Court.

In ruling that Plaintiffs' failed to satisfy the onerous standard of showing Chaffee's and Froese's conduct to be "obviously egregious," this Court described the event as "indisputably chaotic" and pointed to the need for officers to "quickly disarm the shooter to protect innocent bystanders." The Court was perturbed by the fact that "[f]ollowing the shots, the bulk of the crowd ran south, while Smart ran north." And this one fact led the Court to conclude that "[i]t was not egregious for Officers Chaffee and Froese to shoot at Smart under the mistaken perception that he was the active shooter."[14] As discussed amply below, however, this determination was based on a critical error.

## A. The Court misapprehended the facts, failed to view the facts in the light most favorable to Plaintiffs and did not draw all inferences in their favor.

---

[12] Doc. 191, ¶ 32 (Chaffee Dep. at 121:23 – 122:18 (Def.'s Ex. 7)).

[13] Doc. 191, ¶ 36 (Froese Dep. at 80:14-23 (Def.'s Ex. 8)).

[14] *Id.* at pp. 47-48.

At the summary judgment stage, the Court must view the facts in the light most favorable to the non-moving party and the non-moving party is entitled to all reasonable inferences from the record.[15] Before discussing the Court's misapprehension of the facts, it is important to catalog the Court's factual findings. To this end, the Court found the following:

1.    Shots were heard by witnesses and officers in Old Town in the early morning hours at issue.[16]

2.    The initial shots did not come from Smart's immediate area.[17]

3.    Defendants failed to show how an officer would be reasonable in reaching the mistaken conclusion that the initial shots were from a gun fired by Smart.[18]

4.    Smart did not hold a gun when he was pursued and shot by Froese and Chaffee.[19]

5.    Chaffee's and Froese's perception that Smart held a gun was unreasonable.[20]

6.    While most of the crowd ran south, Smart ran north. The Court found that this was one fact that a reasonable officer might view as indicating Smart was the shooter, not a member of the crowd fleeing the shooter.[21]

7.    Smart never threatened the officers or others and, therefore, it was unreasonable for Chaffee and Froese to have viewed Smart as an immediate threat.[22]

8.    Smart was not attempting to close the distance between himself and the officers; rather, he was running away. As a result, Smart did not pose a threat to the safety of the officers or others.[23]

9.    Neither Froese nor Chaffee – or any other officer – issued a warning or instructed Smart to drop his perceived weapon before they fired at him.[24]

10.   Chaffee shot Smart three times while Smart was lying on the ground.[25]

---

[15] *McCoy v. Meyers*, 887 F.3d 1034, 1044 (10th Cir. 2018).
[16] Doc. 205, p. 33.
[17] Doc. 205, p. 33.
[18] Doc. 205, p. 34.
[19] Doc. 205, pp. 21, 32.
[20] Doc. 205, p. 34.
[21] Doc. 205, p. 34-35.
[22] Doc. 205, p. 35.
[23] Doc. 205, p. 35.
[24] Doc. 205, pp. 24, 35.
[25] Doc. 205, p. 29.

11.    The facts did not demonstrate that deadly force was necessary to prevent serious physical harm or to prevent the escape of a suspect who had just committed a crime involving serious physical harm.[26]

12.    Froese's and Chaffee's belief that Smart had just committed a serious offense or was an immediate threat when they shot and killed him was unreasonable.[27]

13.    A reasonable officer would not have been justified in reaching a determination that Smart was attempting to evade arrest.[28]

14.    Smart "was simply acting like everyone else, moving to get away from bullets being fired, rather than moving to evade arrest."[29]

15.    Chaffee shot Smart three times after Smart had fallen to the ground.[30]

16.    A reasonable officer would have had time to see there was no gun in Smart's hand and that he was not a threat at the time he was shot in the back.[31]

Therefore, viewed in the light most favorable to Smart, the Court found that a reasonable jury could conclude that: (1) Smart did not possess a handgun; (2) Smart had committed no crime; (3) Smart was not attempting to flee the scene of a crime in an attempt to evade arrest; (4) Smart did not pose a threat of immediate or serious injury to officers or others; (5) Chaffee shot Smart in the back three times while he was lying on the ground; and (6) Chaffee had ample time to determine Smart was not a threat before he shot him in the back on the ground. Based on the foregoing factual determinations, the Court correctly held that both Froese and Chaffee violated Smart's Fourth Amendment right to be free from an unreasonable use of deadly force.[32]

When the Court turned its analysis to the second prong of the qualified-immunity analysis, however, the Court erroneously determined that, under the factual circumstances, Chaffee's and Froese's

---

[26] Doc. 205, pp. 36-37.
[27] Doc. 205, p. 37.
[28] Doc. 205, p. 38.
[29] Doc. 205, p. 39.
[30] Doc. 205, p. 41.
[31] Doc. pp. 41-42.
[32] Doc. 205, p. 43.

conduct was not "obviously egregious." The Court arrived at this conclusion because it determined that "[f]ollowing the shots, the bulk of the crowd ran south, while Smart ran north."[33] According to the Court, Smart's decision to run north – even though the Court found that Smart was "simply acting like everyone else" – gave Chaffee and Froese reason to believe, even mistakenly, that he was the active shooter because the "bulk of the crowd" ran south.[34] In drawing this inference, the Court failed to view the facts in the light most favorable to Smart and ignored several critical facts in the record that bear on the qualified-immunity inquiry – namely, that the Court's inference contradicts Froese's and Chaffee's own testimony; that numerous people ran with Smart, or in the direction of Smart, including, but not limited to, Rolando Miller, Darel Lucas and Ta'Tiona Nolen; and that people in crowd ran in every direction imaginable.

This error is fatal to the Court's analysis, because, properly construing the facts in the light most favorable to Smart, and drawing all inferences in his favor, a jury could find that running north was not unusual or atypical or sufficient to support Chaffee's and Froese's mistaken perception that Smart was an active shooter.  To the contrary, a reasonable jury, after reviewing all of the evidence in the case, may reach the opposite conclusion drawn by this Court. Moreover, the Court's inference is not only controverted by Froese's and Chaffee's own testimony, it is a theory that the Defendants themselves do not even proffer because it is incorrect and irrelevant to Froese's and Chaffee's decision to kill Marques Smart.

Based on this unsubstantiated inference, the Court maintained that Plaintiffs could not rely on the excessive-force principles set forth by the Supreme Court in *Graham v. Conner* because, under the facts as determined by this Court, this was not "an obvious case." The reason this was not an obvious case, according to the Court, was because it was not "egregious" for Chaffee and Froese to shoot and kill Smart under the mistaken perception that he was an active shooter based on the direction in which he ran.

---

[33] Doc. 205, p. 48.
[34] *Id.*

Consequently, the Court applied the strict interpretation of "clearly established" recently set forth by the Tenth Circuit in *Pauly v. White*,[35] which requires plaintiffs to find a case "close enough on point to make the unlawfulness of the [the officer's] actions apparent" in order to abrogate qualified immunity.[36] Because Plaintiffs did not cite – nor could the Court find – a case "close enough on point," the Court granted Chaffee and Froese qualified immunity and further held that it "was not a plain or knowing violation of the law for Officer Chaffee to have shot Smart in the seconds after Smart had fallen to the ground"[37] – even though Smart was unarmed and did not pose a threat to the officers or others.

In its Order, the Court does not cite to the record to support its finding that Smart ran north, while the bulk of the crown ran south. However, Defendants' Statement of Facts contains one fact pertaining to this issue from which the Court may have relied upon in drawing its erroneous conclusion.[38] At Paragraph 31, relying upon the deposition testimony of Chaffee, Defendants stated: "Everyone scattered, mainly to the south."[39] In their Response to Defendants' Statement of Facts, Plaintiffs admitted this fact for the purposes of summary judgment only.[40]

Even so, Plaintiffs' limited admission of this fact was not based on the objective truth of the statement. Rather, it was based on the statement accurately reflecting or summarizing Chaffee's deposition testimony. In other words, Plaintiffs did not deny this fact because it was supported by Defendants' citation to Chaffee's deposition testimony – despite the fact that there were differing accounts about the crowd's reaction to shots being fired by both police officers and civilians – even by Chaffee himself.

What's more, Froese's and Chaffee's own testimony stands in stark contrast to the Court's

---

[35] Doc. 205, p. 48; *see also Pauly v. White*, 874 F.3d 1197, 1223 (2017).
[36] Doc. 205, p. 48; *Pauly*, 874 F.3d at 1223.
[37] Doc. 205, p. 48.
[38] Doc. 191, ¶ 31.
[39] *Id.*
[40] Doc. 197, ¶ 31.

mistaken inference. For instance, the evidence presented by Defendants shows that Chaffee testified that he believed Smart was the shooter because he was last person to start running and because he allegedly had his arm extended pointing a gun at the people that were running.[41] Froese, on the other hand, testified that he locked in on Smart the moment he allegedly saw Smart brandishing a weapon.[42] Despite Chaffee's and Froese's testimony, the Court, viewing the facts in the light most favorable to Defendants, inferred that Chaffee and Froese mistakenly perceived Smart as an active shooter, not based on their testimony or the arguments set forth by Defendants, but rather based on a theory espoused *sua sponte* by this Court.

This was error. On summary judgment, the Court must view the facts in the light most favorable to Smart and draw all inferences in his favor.[43] In finding that Froese's and Chaffee's action were not "obviously egregious" based on a fact that, as discussed in more detail below, is not supported by the evidence or relied upon by Defendants as justification for their actions, the Court failed to look at the totality of the circumstances and draw all inferences in Smart's favor. Indeed, there is nothing in the record to establish that, by running north, Smart was acting erratically or bringing justifiable suspicion upon himself such that this Court could properly infer that Froese and Chaffee did not violate his clearly established constitutional rights. Yet, this is the **only** fact this Court concluded "weighs in defendants' favor."[44]

But there is ample evidence – including Chaffee's own testimony – that undermines the Court's finding that, by running north, Smart's actions were unusual or atypical of the panicking crowd. For instance, Officer Chaffee specifically testified as follows:

Q.      Okay. Did everybody start running?

A.      Yeah –

---

[41] Doc. 191, ¶ 32 (Chaffee Dep. at 121:23 – 122:18 (Def.'s Ex. 7 (Doc. 191-2))).

[42] Doc. 191, ¶ 36 (Froese Dep. at 80:14-23 (Def.'s Ex. 8 (Doc. 191-3))).

[43] *McCoy v. Meyers*, 887 F.3d 1034, 1044 (10th Cir. 2018).

[44] *Id.* at p. 35.

Q.      And they probably –

A.      -- for the most part.

Q.      Probably in different directions, right?

A.      It was scattered, yeah. It seemed like a majority of the people were running, and the reason why I say this is when I eventually cross the street, I was unobstructed, and so I would have seen the – there wasn't hundreds of people running to the north, but they were more running to the south.[45]

Officer Robert Gulliver also testified that people dispersed in every direction after shots rang out:

Q.      All right, all right. And when you heard the second series of shots, were you looking at Officer Froese or were you still looking up in the garage?

A.      I was looking all around at that point, I mean the garage. The people in the street, they're all running every which way and screaming and yelling. So, you know, we're just trying to make it through the chaos and find out who is actually shooting.[46]

Plaintiffs' Additional Disputed Material Facts That Preclude Summary Judgment of Plaintiffs' Claims contained facts – all of which were uncontroverted by Defendants – which, if viewed in the light most favorable to Smart, also controverts the Court's unsupported inference. For example:

13.     James stated that the crowd of people started "running around crazy" after the gunshots. (LaTyra James Dep., 17:18-18:14).[47]

17.     While the crowd was running around James saw Smart try to run down an alleyway on the north side of the parking garage. (LaTyra James Dep., 21:14-22:17; 40:25-41:16).[48]

117.    [Darel] Lucas attempted to run north and west into the north entryway of the parking garage for safety. (Lucas, 13:7-17; 36:5-8).[49]

118.    Lucas was in the process of running to the north entryway of the parking garage when he was shot in the leg. (Lucas, 14:7-10; 15:22-16:20).[50]

---

[45] Chaffee Dep. at 114:1 – 17.
[46] Robert Gulliver Dep. at 49:14-23 (Doc. 197-4).
[47] Doc. 197, p. 56.
[48] *Id.*
[49] *Id.* at 65.
[50] *Id.*

122.     Nolen began to run west through the alleyway upon hearing the gunshots. (Nolen, 16:15-23).[51]

Latyra James, who was standing near Smart when the first shots were fired, described the chaotic

scene as follows:

"Well, I was just kind of, you know, trying to figure out like which way I should go because it was like a lot of – once the gunshots went off, everybody is like running around crazy. People was like actually falling and getting stepped on and stuff like that trying to run. And the gunshots just kept getting closer and closer. So I'm just standing there because I don't know which way to go."[52]

James further testified that after shots were fired:

"I mean everybody that was standing in that whole area [i.e., where Smart was hanging out] was just kind of like, you know, panicking, like, well, where it is coming from. People started running toward us, so we figured that maybe it's coming from that way. And they were talking about people fighting down there and stuff like that. And I'm just standing there because I don't want to run the wrong way. And they're running and officers had their guns drawn too, so they don't even know where to run. It's just like so much chaos. People is running, everyone just started screaming and yelling and people is running in the garage to get in their cars and stuff like that."[53]

Based on James's testimony, the people "running toward us" were heading north, like Smart, as the

"people fighting down there" were south of the parking garage. James consistently testified throughout

her deposition that "everybody just started running everywhere,"[54] "[e]verybody is running, falling, getting

stepped on, ran over,"[55] "people running in every which way."[56]

Meanwhile, Ta'Tiona Nolen testified that the bulk of the crowd ran west, the same direction she

ran when shots rang out.[57] But Rolando Miller, who was standing next to Smart when the initial shots

---

[51] *Id.* at 66.
[52] Doc. 197, p. 56; Latrya James Dep. at 17:22 – 18:5 (Doc. 197-17).
[53] Latrya James Dep. at 21:16-22:7(Doc. 197-17).
[54] Latrya James Dep. at 41:10-11 (Doc. 197-17).
[55] Latrya James Dep. at 42:22-23 (Doc. 197-17).
[56] Latrya James Dep. at 56:3 (Doc. 197-17).
[57] Ta'Tiona Nolen Dep. at 37:8-23 (Doc. 197-22).

were fired, ran north alongside Smart. Miller turned left into the garage, while Smart continued running north toward the alley.[58]

On the other hand, Darel Lucas, who was standing near the parking garage and facing south when shots were fired, turned and ran northwest.[59] Importantly, Lucas also happened to be wearing a "gold" t-shirt that night and was shot in the leg by officers when they opened fire.[60]

By finding that Chaffee's and Froese's actions were not "obviously egregious" because they mistakenly believed that Smart was the shooter because Smart ran north, the Court ignored other evidence in the record, failed to properly view the evidence in the light most favorable to Smart and draw all inferences in his favor. Moreover, the Court's finding, taken to its logical extreme, would allow any officer to shoot any individual under similar circumstances who ran a different direction from the "bulk of the crowd." Because, according to this Court, it would not be egregious for the officer to shoot an individual running in the opposite or non-majority direction under the mistaken perception that the individual was the active shooter – even if the officer's testimony does not comport with the Court's inference, there is evidence in the record controverting the fact or Defendants do not raise this theory as a defense. This cannot be the law.

**B.  The Court misapplied the law in finding that Chaffee's and Froese's actions were not "obviously egregious."**

The Court misapplied the law, finding that Chaffee and Froese did not violate a "clearly established" constitutional right when they opened fired on an unarmed black man running in a panicked crowd who posed no objective threat of harm to officers or others, had committed no crime, and was not resisting or evading arrest. Additionally, the Court misapplied the law in finding that Chaffee did not

---

[58] Rolando Miller Dep. at 25:21-26:15; 30:7-10, attached hereto and incorporated herein as Exhibit A.

[59] Darel Lucas Dep. at 17:8-23; 33:23-25; 36:2-8, attached hereto and incorporated herein as Exhibit B.

[60] *Id.* at 37:7-12; 14:7-10; 15:22-16:20 (Doc. 197-21).

violate Smart's clearly established Fourth Amendment rights when he shot Smart three times in the back while he was lying face down on the ground in the four-to-five seconds after Smart fell. In reaching this conclusion, the Court relied primarily on two recent opinions handed down by the Supreme Court -- *White v. Pauly*[61] and *Kisela v. Hughes*[62] -- and *Pauly v. White*,[63] an opinion recently decided by the Tenth Circuit. Yet, these cases are factually distinguishable from this case and do not support the Court's holding.

To show that a law is "clearly established," a plaintiff must identify pre-existing precedent that places the "constitutional question beyond debate."[64] A plaintiff must identify "a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other circuits must have found the law to be as the plaintiff maintains."[65] The relevant precedent need not be directly on point, but the plaintiff "must do more than cite case law announcing a legal rule 'at a high level of generality.'"[66] The precedent must be particularized to the facts of this case, making it sufficiently clear such that every reasonable official would have known that the defendant's actions would violate the plaintiff's rights.[67] But the Tenth Circuit has counseled that "[w]e cannot find qualified immunity wherever we have a new fact pattern."[68] *Casey* applied a "sliding scale" concept to evaluating whether a right is clearly established—the more egregious the conduct, the less specificity is required from prior case law. This sliding scale test has been called into question recently, but the Tenth Circuit has not decided that it conflicts with Supreme Court authority.[69] If force is clearly unjustified based on

---

[61] 137 S.Ct. 548 (2017).

[62] 138 S.Ct. 1148 (2018).

[63] 874 F.3d 1197 (10th Cir. 2017).

[64] *Yeasin v. Durham*, 719 Fed.Appx. 844, 850 (10th Cir. 2018) (quoting *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015)).

[65] *Cortez v. McCauley*, 478 F.3d 1108, 1114–15 (10th Cir. 2007) (citation omitted).

[66] *Yeasin*, 719 Fed.Appx. at 850.

[67] *Reichle v. Howards*, 566 U.S. 658, 664 (2012).

[68] *Casey v. City of Fed. Heights*, 509 F.3d 1278, 1284 (10th Cir. 2007).

[69] *See McCoy v. Meyers*, 887 F.3d 1034, 1053 n.22 (10th Cir. 2018).

the *Graham* factors, then the court may conclude that a right is clearly established, even in the absence of similar prior cases.[70]

Critically, this Court ruled that Smart: (a) did not have a weapon; (b) was not an immediate threat; (c) had not committed a crime and, therefore, was not attempting to evade arrest; and (d) did not pose a threat to the safety of the officers or others.[71] Thus, viewed in the light most favorable to Plaintiffs and drawing all inferences in their favor, Smart was **not** a fleeing felon. Applying the Supreme Court's guidance and the weight of authority from the Tenth Circuit, among others, this is an "obvious case." The Supreme Court's precedents make clear that a police officer may only deploy deadly force against an individual if the officer "has probable cause to believe that the [person] poses a threat of serious physical harm, either to the officer or to others."[72] It is equally well established that any use of lethal force must be justified by some legitimate governmental interest.[73] Because the Court has already held that Froese and Chaffee plainly lacked any legitimate interest justifying the use of deadly force against a man who posed no objective threat of harm to officers or others, had committed no crime, and was not resisting or evading arrest, they are not entitled to qualified immunity.

In its ruling, this Court relied on the Supreme Court's recent decision in *White v. Pauly.* In *White v. Pauly*, two officers responded to Samuel Pauly's house late one evening after receiving reports that Daniel Pauly, Samuel's brother, had been involved in a road-rage incident while intoxicated.[74] The officers demanded that the brothers come outside, but did not clearly identify themselves as police.[75] The two brothers armed themselves and yelled, "We have guns."[76] Officer White, who was not aware

---

[70] *Morris v. Noe*, 672 F.3d 1185, 1197–98 (10th Cir. 2012)
[71] Doc. 205, p. 35.
[72] *Tennessee v. Garner*, 471 U.S. 1, 11 (1985).
[73] *Kisela*, 138 S.Ct. at 1158.
[74] *Id.* at 549.
[75] *Id.* at 550.
[76] *Id.*

that the officers had not told the brothers they were confronting police, arrived at the house at the moment one brother shouted they had guns. He drew his weapon and took shelter behind a stone wall near the front of the house. A few seconds later, Daniel stepped out of the back door of the house and fired two shotgun blasts while screaming loudly. A few more seconds passed and Samuel opened a front window and pointed a handgun in Officer White's direction. One of the first officers shot at Samuel but missed. Four to five seconds later, Officer White shot and killed Samuel.[77]

Daniel brought suit against the officers, alleging that they used excessive force, and all three officers moved for summary judgment on qualified immunity grounds.[78] The district court denied qualified immunity, and the Court of Appeals for the Tenth Circuit affirmed. As to Officer White, the court held that a jury could have found that his use of deadly force was unreasonable, even though he arrived late on the scene and did not participate in the events leading up to the armed confrontation.[79] It further decided that clearly established law existed at the time of Samuel's death notifying Officer White that a reasonable officer in his position would have believed that a warning was required despite the threat of serious harm.[80] The officers subsequently petitioned for certiorari.

The Supreme Court held that , only with respect to Officer White, it was not a situation where it was "obvious" that there was such a violation of clearly established law under *Garner* and *Graham*. Of note, the majority did not conclude that White's conduct, such as his failure to shout a warning, constituted a run-of-the-mill Fourth Amendment violation. Indeed, as noted, it recognized that the case presented a unique set of facts and circumstances in light of White's late arrival on the scene. According to the Supreme Court, this alone should have been an important indication that White's

---

[77] *Id.*
[78] *Id.*
[79] *Id.* at 551.
[80] *Id.*

conduct did not violate a "clearly established" right.[81] The Court held that Officer White did not violate clearly established law because his assumption that his fellow officers followed procedure was reasonable, despite failing to provide a warning before using deadly force, in light of the "unique circumstances" surrounding Officer White's late arrival on the scene.[82] The Court reasoned that "clearly established federal law does not prohibit a reasonable officer who arrives late to an ongoing police action in circumstances like this from assuming that proper procedures" were followed before his arrival.[83] Accordingly, the Court found that Officer White was entitled to qualified immunity.

Importantly, however, this holding did **not** apply to the other two officers who were denied immunity because they were present throughout the events, just like Froese and Chaffee here. At its core, the Supreme Court granted White immunity because it found that he was legally entitled to assume the other officers who arrived at the scene a few minutes before him followed proper procedure by adequately identifying themselves.[84] Because it was reasonable for White rely on this assumption before using deadly force, the Court granted him immunity.

Factually, *White* is inapposite from this case. Both Froese and Chaffee witnessed the events of March 10, 2012. While the facts in both cases demonstrate that the officers did not properly identify themselves or shout a warning before firing, it was undisputed in *White* that one of the brothers said, "We have guns." What's more, a few seconds later, Daniel stepped out of the back door of the house and fired two shotgun blasts while screaming loudly. A few more seconds later, Samuel opened a front window and pointed a handgun in Officer White's direction. In contrast, viewed in the light most

---

[81] *Id.* (internal citations omitted).

[82] *Id.*

[83] *Id.*

[84] Notably, *White v. Pauly* also stands for the proposition that two different officers involved in the same events can have two different results from a qualified immunity analysis.

favorable to Plaintiffs, Smart did not possess a handgun or pose a threat to the officers or others. Moreover, construing the facts in the light most favorable to Plaintiffs, this Court found that it was unreasonable for Chaffee and Froese to believe Smart had just committed and was attempting to evade arrest. In *White*, however, the officers had reason to believe Daniel had committed a crime, which is why the officers went to the brother's house.

Although the Supreme Court faulted the lower court for failing to identify a case with similar factual circumstances, it did so in the context of the "unique set of facts and circumstances" presented by the case.[85] Because Officer White's conduct did not amount to a "run-of-the-mill" constitutional violation, a case with similar facts would be required to put the officer on notice that his conduct violated clearly established law.[86] This is not the case here. This is a "run-of-the-mill" constitutional violation in which Froese and Chaffee shot and killed an unarmed individual who "was simply acting like everyone," posed no threat to the officers or others, had committed a crime and did not possess a weapon.

As a practical matter, the standard advanced by this Court fails to account for the reality that the factual circumstances of each case are, by their nature, unique, and two cases seldom involve nearly identical facts. The Court should therefore look to cases that analyze similar circumstances, such as whether a suspect is armed, the suspect's conduct and proximity to the officer, and warnings given by the officer, to determine whether a reasonable officer would be on notice that his or her actions in a particular factual scenario would fall outside the bounds of the Constitution. As the Supreme Court and Tenth Circuit have recognized, a case presenting a nearly identical alignment of facts is not required so long as the existing cases would enable an officer, as a matter of reason and common sense, to understand that his or her conduct in a specific situation crossed the constitutional line.

---

[85] *Pauly*, 137 S.Ct. at 552.
[86] *Id.*

With this guidance in mind, this Court must determine whether a constitutional rule applies with obvious clarity such that it placed the officers in this case on notice that their conduct was unlawful. Despite the absence of a case directly on point, Plaintiffs urge this Court to apply the general principle that "[a] police officer may not seize an unarmed, nondangerous suspect by shooting him dead."[87] At a more particularized level, Smart had the right not to be shot in the back at close range or while lying on the ground because he was unarmed, had committed no crime, made no apparent moves to attack an officer or bystander and posed no threat to the officers or others. In this situation, the *Graham* factors indicate that the force was unjustified. And there is ample Tenth Circuit case law that has said that firing shots, at very close range, at a non-threatening suspect is unreasonable.[88]

Importantly, the Tenth Circuit affirmed a district court's denial of summary judgment on the issue of qualified immunity and the lower court's proposed formulation of the victim's constitutional right at issue in *King v. Hill* that "[a]t time Hill shot King, the law was clearly established that a law enforcement officer may not use deadly force to seize an unarmed person who is not posing a threat to the officers or others."[89] There, the Tenth Circuit concluded that the "formulation of the right meets the clearly established test by avoiding generalities in favor a right tailored to the essential facts of the case."[90]

And, in *Morris v. Noe*, the Tenth Circuit cited an Eleventh Circuit case, *Thornton v. City of Macon*, 132 F.3d 1395, 1400 (11th Cir. 1998) (holding that "officers were not justified in using *any* force, and a reasonable officer thus would have recognized that the force was excessive" when the arrestees had not committed a serious crime, did not pose an immediate threat, and were not actively resisting

---

[87] *Tennessee v. Garner*, 471 U.S. 1, 11 (1985).
[88] *See Myers v. Brewer*, 2018 WL 3145401, at *8-9 (D.Kan. June 27, 2018) (denying qualified immunity, under *Garner*, to officer who shot a "beanbag round" at close range from a 12-gauge shotgun at decedent who was not brandishing a weapon or attempting to escape).
[89] 615 Fed.Appx. 470, 477 (10th Cir. 2015).
[90] *Id.*

arrest), for the principle that a reasonable officer would know that such force was not justified where the victim posed no threat to the officers or others, nor did the victim resist or flee.[91]

The District of Kansas's decision in *Myers v. Brewer* echoes this point. There, the District of Kansas recently refused to grant qualified immunity to an officer who shot and killed an unarmed man who reportedly had been threatening people with a shotgun in the street in front of a bar.[92] By the time the officers arrived, Myers had returned home, put away the shotgun and had taken his dog for a walk.[93] Eventually, Myers was located in his backyard.[94] Brewer and another officer instructed Myers to put his hands up and get on the ground.[95] Myers did not comply with either command and was apparently moving toward the house.[96] After about eight seconds of yelling, Brewer fired a beanbag round from his 12-gauge shotgun at Myers's chest, killing him.[97] There, the Court declined to grant Brewer qualified immunity, holding that "the *Graham* factors indicate that the force was unjustified" where the victim did not possess a weapon or pose a serious or immediate threat to the officers or others.[98] Like the victim in *Myers*, Smart was unarmed and did not pose a serious or immediate threat to the officers or others.

Similarly, in *Stewart v. City of Prairie Village*, the District of Kansas found that a city police officer's use of deadly force against a mentally-ill woman during a barricade situation was excessive under the Fourth Amendment where the facts showed that one of the three successively fired bullets entered the victim's back, allowing for a reasonable inference that the victim was not facing the officers

---

[91] *Morris v Noe*, 672 F.3d 1185, 1198 (10th Cir. 2012).
[92] *Myers*, 2018 WL 3145401, at *2.
[93] *Id.*
[94] *Id.*
[95] *Id.*
[96] *Id.*
[97] *Id.*
[98] *Id.*, at *8.

when the officer shot and killed her.[99] The Court found that because the victim was not threatening the officers and was facing away from or running from the officers, a reasonable officer would not have probable cause to believe that there was a threat of serious physical harm to officers or others that would justify the use of deadly force.[100]

In a similar vein, the Tenth Circuit affirmed a district court's decision denying summary judgment based on qualified immunity in *Tenorio v. Pitzer*.[101] There, like here, the district court had concluded that a jury reasonably could find that the officer lacked probable cause to believe that the individual presented a threat of serious physical harm to the officer or another.[102] The Tenth Circuit affirmed this conclusion, *id.*, and its analysis should significantly inform this Court's decision.

Like Smart, the suspect in *Tenorio* did not charge the officer, did not say anything threatening to the officer, and made no threatening motions at the officer.[103] *Tenorio* analogized that case to *Zuchel v. City & County of Denver, Colorado*, 997 F.2d 730 (10th Cir. 1993) where the Tenth Circuit affirmed a jury verdict concluding that an officer had used lethal force improperly against an individual.[104] The victim of lethal force (1) was holding a knife and not a gun, (2) had not charged the officer, and (3) had not made any slicing or stabbing motions at the officer.[105] Likewise, in *Walker v. City of Orem,* the Tenth Circuit affirmed a verdict finding that an officer had used unreasonable lethal force against an individual who possessed only a knife (although the shooting officer thought the individual had a gun), was alleged only to have committed vehicular theft, had made no threats against others, did not advance on any of the officers, and was known to be simply suicidal, not homicidal.[106]

---

[99] 904 F.Supp.2d 1143 (D. Kan. 2012).
[100] *Id.* at 1154.
[101] 802 F.3d 1160, 1166 (10th Cir. 2015).
[102] *Id.* at 1161.
[103] *Id.* at 1166.
[104] *Id.*
[105] *Zuchel*, 997 F.2d at 735–36.
[106] *Walker v. City of Orem*, 451 F.3d 1139, 1160 (10th Cir. 2006).

In contrast, the Tenth Circuit has held that officers used deadly force permissibly when: (1) a suspect already had threatened violence against himself and others, (2) the officers responded to a late night emergency call, (3) the officers encountered the suspect with a knife over a foot long, (4) the officers repeatedly told the suspect to drop his knife to no avail, (5) the suspect was standing on steps above the officers, (6) the suspect pointed the blade towards the officers in a threatening manner, (7) the suspect turned towards the shooting officer and took a step towards him, and (8) the suspect and the shooting officer were some 7 to 20 feet apart.[107] The Tenth Circuit also has held deadly force was reasonably used when: (1) the suspect had a firearm, (2) the suspect previously had threatened his wife with the firearm, (3) the suspect had pointed the firearm at the officers shortly before the officers shot, (4) the suspect stated he would fire on himself and the officers, (5) the suspect refused to comply with police demands to drop his weapon, and (6) these things all happened within a few seconds.[108]

Applying these binding authorities to this case compels a finding that, viewing the facts in the light most favorable to Smart and drawing all inferences in his favor, Froese and Chaffe violated Smart's clearly established right to be free from the use of deadly force and are not entitled to qualified immunity. After all, in contrast to cases in which the Tenth Circuit has applied qualified immunity to the officers use of deadly force, this Court found that: (1) Smart did not possess a weapon; (2) Smart had not committed a crime and was not attempting to flee the scene of a crime; (3) Smart never threated the officers or others; (4) Smart did not pose an immediate or serious threat to officers or others; and (5) no officers identified themselves or instructed Smart to drop his perceived weapon before Froese and Chaffee killed him.

There is no question that *Tennessee v. Garner* indisputably enshrines the rule that "[a] police officer

---

[107] *Estate of Larsen ex rel. Sturdivan v. Murr*, 511 F.3d 1255, 1260–61 (10th Cir. 2008).
[108] *Thomson v. Salt Lake Cty.*, 584 F.3d 1304, 1318–19 (10th Cir. 2009).

may not seize an unarmed, nondangerous suspect by shooting him dead."[109] *Garner* centered upon a police officer's decision to shoot an unarmed criminal suspect as he was attempting to flee from the scene of a robbery on foot.[110] The police officer testified that he shot the suspect because he was convinced that the suspect would have eluded capture otherwise.[111] Based on those facts, the Supreme Court determined that the police officer had violated the suspect's clearly established constitutional right to be free from excessive force because the suspect was, like Smart, unarmed and did not pose a danger to the officer or public.[112]

      *Garner* is directly on point. But, in *Garner*, it was undisputed that the victim was attempting to flee from the scene of a crime.[113] Here, on the other hand, the Court found that a jury could conclude that a reasonable officer would not be justified in reaching a determination that Smart was a fleeing felon. But rather that Smart "was simply acting like everyone else, moving to get away from bullets being fired, rather than moving to evade arrest."[114] Even so, properly viewing the facts in the light most favorable to Smart and drawing all inferences in his favor, the Court found that a reasonable jury could conclude that he was unarmed and did not pose a threat to the officers or others. Therefore, *Garner* is squarely on point, standing for the proposition that Chaffee and Froese violated a clearly established constitutional right.

      Properly taking the evidence and drawing all inferences in Smart's favor, a reasonable jury could reach the conclusion that Froese and Chaffee did not have a reasonably mistaken perception that Smart was an active shooter simply because he was running north. Moreover, the Defendants do not argue, nor is there any evidence before the Court, that Froese and Chaffee mistakenly believed that Smart was an

---

[109] *Garner*, 471 U.S. at 11.
[110] *Id.* at 3-4.
[111] *Id.* at 4 n.3.
[112] *Id.* at 11.
[113] *Id.* at 3-4.
[114] Doc. 205, p. 39.

active shooter because of the direction in which he ran. As noted above, neither Chaffee nor Froese testified that they believed Smart to be the shooter because of the direction he was running.[115] Because the Court failed to view the facts in the light most favorable to Smart and draw all inferences in his favor on this factual issue, it must be removed from the equation and cannot be relied upon by the Court to insulate Froese and Chaffee from liability.

The same result follows regarding Chaffee shooting Smart in the back four-to-five seconds after he fell to the ground.  The Court held that it was not "a plain or knowing violation" for Chaffee to have shot Smart in the back after he had fallen to the ground.[116] Specifically, the Court found that because there is no case "close enough on point" to render it "beyond debate" that Chaffee's shooting of Smart, in the four-to-five seconds after Smart fell, there was no constitutional violation.[117]

But this finding is controverted by the Court's determination that a reasonable jury could find that Chaffee would have had time to see there was no gun in Smart's hand and that he was not a threat at the time he was shot in the back.[118] Moreover, the Court determined a reasonable jury could find that Smart was unarmed, did not pose a threat of serious injury and was not attempting to flee the scene in order to evade arrest. Based on this determination alone, Chaffee's actions were "egregious." But, when coupled with the four-to-five second gap in which the Court found that a reasonable jury could conclude Chaffee had enough time to stand down, Chaffee's actions were "obviously egregious." If a reasonable jury could find that Smart did not possess a gun or pose a threat to the officers or others, there is no question that Chaffee lacked any legitimate interest justifying the use of deadly force when he shot Smart in the back in the four-to-five second gap after he fell.

---

[115] Doc. 191, ¶ 32 (Chaffee Dep. at 121:23 – 122:18 (Def.'s Ex. 7)); Doc. 191, ¶ 36 (Froese Dep. at 80:14-23 (Def.'s Ex. 8)).
[116] Doc. 205, p. 48.
[117] *Id.* at 49.
[118] Doc. 205 41-42.

The case law available at the time of shooting gave Froese and Chaffee fair warning that their conduct violated the Constitution because of the violation's obviousness when viewed in the light most favorable to Marquez Smart. Despite the Supreme Court's preference that "'clearly established law' should not be defined 'at a high level of generality.'"[119] However, and keeping in mind the central inquiry of whether "exiting precedent...placed the statutory or constitutional question beyond debate,"[120] there are nevertheless some "obvious" cases in which general "standards can 'clearly establish' the answer, even without a body of relevant case law."[121]

This is one such obvious case. Viewing the record in the light most favorable to Plaintiffs, this Court determined that: (1) Smart did not possess a handgun; (2) Smart had committed no crime; (3) Smart was not attempting to flee the scene of a crime in an attempt to evade arrest; (4) Smart did not pose a threat of immediate or serious injury to officers or others; (5) Chaffee shot Smart in the back three times while he was lying on the ground; and (6) Chaffee had ample time to determine Smart was not a threat before he shot him in the back on the ground. Therefore, Froese and Chaffee violated Smart's clearly established constitutional right not to be shot in the back at close range or while lying on the ground because he was unarmed, had committed no crime, made no apparent moves to attack an officer or bystander and posed no threat to the officers or others.[122]

## CONCLUSION

It is settled law that an unarmed individual has a right not to be shot dead when he does not pose a risk of danger to police or the public. Viewing the facts in the light most favorable to Plaintiffs,

---

[119] *White*, 137 S.Ct. at 552.

[120] *Id.* at 551.

[121] *Brosseau v. Haugen*, 543 U.S. 194, 199 (2004). *See also Weigel v. Broad*, 544 F.3d 1143, 1154 (10th Cir. 2008) ("We do not think it requires a court decision with identical facts to establish clearly that it is unreasonable to use deadly force when the force is totally unnecessary to restrain a suspect or to protect officers, the public, or the suspect himself.")

[122] *See, e.g., King v. Hill*, 615 Fed.Appx. 470, 477 (10th Cir. 2015).

the evidence shows that Froese and Chaffee had violated Smart's clearly established constitutional right to be free from deadly use of force. Because Froese and Chaffee lacked any legitimate interest justifying the use of deadly force against a man who was unarmed, posed no objective threat of harm to officers or others, had committed no crime, and was not fleeing the scene of a crime or evading arrest, they are not entitled to qualified immunity. Precedent existing at the time of the shooting clearly established the unconstitutionality of their conduct. Because, taking the facts in the light most favorable to Smart, it is "beyond debate" that Froese's and Chaffee's use of deadly force was objectively unreasonable, Froese and Chaffee should not be insulated by qualified immunity.

*Respectfully submitted by,*

**PROTZMAN LAW FIRM, LLC**

/s/ Andrew B. Protzman
Andrew B. Protzman          KS No. 18015
1100 Main Street; Suite 2430
Kansas City, Missouri 64105
Tel:(816) 421-5100
Fax: (816) 421-5105
andy@protzmanlaw.com

*and*

KUHLMAN & LUCAS, LLC

/s/ Bradley D. Kuhlman
Bradley D. Kuhlman      KS Bar No. 7844
1100 Main Street, Suite 2550
Kansas City, Missouri 64105
Tel: (816) 799-0330
Fax: (816) 799-0336
brad@kuhlmanlucas.com

**Attorneys for Plaintiffs**

## CERTIFICATE OF SERVICE

I hereby certify that on September 4, 2018, I electronically filed the foregoing with the Clerk of the Court, using the CM/ECF system, which sent notice to the following attorneys of record:

Jennifer Magaňa  #15519
Sharon L. Dickgrafe  #14071
Chief Deputy City Attorney
City Hall-13th Floor
455 North Main
Wichita KS 67202
Tel:    (316) 268-4681
Fax:    (316) 268-4335
sdickgrafe@wichita.gov
**Attorney for Defendant City of Wichita**

J. Steven Pigg  #09213
Fisher, Patterson, Sayler & Smith, L.L.P.
3550 S.W. 5th Street
P. O. Box 949
Topeka, KS  66601-0949
Tel:    (785) 232-7761
Fax:    (785) 232-6604
spigg@fisherpatterson.com
**Attorney for All Defendants**

/s/ Andrew B. Protzman
**Attorney for Plaintiffs**